**MOOD FOR A DAY, INC., Plaintiff,**

v.

**SALT LAKE COUNTY,
et al., Defendants.**

**Civil No. 92–C–765B.**

United States District Court,
D. Utah,
Central Division.

Nov. 27, 1995.

Brian Barnard, Andrea Garland, Natasha Hawley, Salt Lake City, UT, for Plaintiff.

Patricia Marlow, Darrell Smith, Salt Lake City, UT, for Defendants.

## OPINION AND ORDER

BENSON, District Judge.

## INTRODUCTION

This case presents a fundamental free speech issue: Did the Salt Lake County Fair Board have the right to expel plaintiff's pro-marijuana booth from the 1992 County Fair?

## FACTUAL BACKGROUND [1]

The Salt Lake County Fair finds its roots in the "Black and White Days" of the 1930s. As early as 1932, 4–H Club members in Salt Lake County, Utah, began meeting annually to display their livestock and handicraft, taking the name for their fair from the black and white Holstein dairy cattle predominant in the area. (Affidavit of Roene Wood ¶ 1.) From 1932 to 1934, the members met each fall in a different city in Salt Lake County. (*Id.*) In 1935, the fair's name changed to "Farm Bureau Days" when the local Farm Bureau became involved. (*Id.* ¶ 2)

In 1936, leaders from the 4–H Club, Farm Bureau, and Future Farmers of America held the first official "Salt Lake County Fair" in Murray, Utah. (*Id.* ¶ 3.) The organizers held it in Murray again in 1937. That same year, the unofficial conglomeration of agricultural organizations that had become known as the Salt Lake County Fair Association decided to incorporate. In June 1937, the Association became Salt Lake County Fair, Inc., a nonprofit Utah corporation. The newly formed Fair corporation created a Board of Directors consisting of various interested individuals and organization leaders. In addition, the articles of incorporation appointed various officers to oversee the operations of the Fair.

The articles of incorporation describe the reasons for the Fair organization:

> The objects and purposes of this Association are to promote the general welfare of the members by effecting improvement in the production, quality, sale and distribution of products of the soil and of manufactured articles, and generally to enhance the interests of the community by establishing, conducting and maintaining fairs and exhibitions within the County of Salt Lake, State of Utah; and in effecting such objects and purposes, to cooperate with the Utah State Farm Bureau Federation, the Salt Lake County Farm Bureau Federation, the Extension Service of the United States Department of Agriculture, the Utah State Agricultural College, and other educational institutions, in fostering educational exhibits, contests, and demonstrations, including the activities of the "Future Farmers" and of the "4–H Clubs."

(Articles of Incorporation art. II.) Under the articles, the special powers of the Board of Directors include the power "[t]o arrange for, sponsor, conduct and manage the display of all desirable and proper exhibits of every kind at any and all County Fairs held in Salt Lake [C]ounty, State of Utah." (*Id.* art. VIII(b).)

In 1937 or 1938, Murray City leaders convinced the new Fair Board to locate the Fair permanently in Murray. (Wood Aff. ¶ 5.) The city offered to donate approximately 2.8 acres of land for a permanent site. (*Id.* ¶ 4.) From that time forward, the Salt Lake County Fair has been held in Murray, continuing with its principal themes of livestock, agriculture, and handicraft displays.

Over the years, as Salt Lake County has become less rural and increasingly urbanized, the Fair has nevertheless maintained its primary agricultural and handicraft focus. (*See, e.g.,* Statement of Darrell H. Smith, Exh. A to Defendants' Statement of Uncontroverted Facts.) Fair exhibits and displays include livestock, home economics, hobbies, horticulture, flowers, and fine art. (*See, e.g.,* Exh. ee to Statement of Undisputed Facts in Supp. of Plaintiff's Am.Mot. for S.J.)

The Fair is open to the public at large. People of all ages attend. However, the Fair has had a special orientation to youth and to

---

**1.** This section does not resolve factual issues, but rather provides the factual context for the legal disputes.

families. For example, the Board of Directors has always had the policy that no admission fee be charged to patrons of the Fair, to allow parents with large families to bring all of their children to the Fair. The result has been a family oriented event, with a large number of children and teenagers on the premises at all times. (Wood Aff. ¶ 7.)

In addition to the agricultural and craft displays and exhibits, there are more than 200 booths located throughout the Fairgrounds. (*See* Plaintiff's Undisputed Facts, Exh. ee.) The Fair Board leases these booths to various commercial, governmental, and educational entities and exhibitors to display products and disseminate information during the Fair. (Plaintiff's Facts ¶ 56.) The only consistent Fair Board policy restricting a certain type of booth prohibits leasing booth space to political candidates and political parties. (*See* Deposition of Darrell Smith at 53; Deposition of Grace Cameron at 78.) [2]

Besides that narrow exclusion, the Fair Board has leased space to all comers subject to the rules and regulations of the Fair. These rules include the written Fair Board policy, printed in every Fair "Premium Book" and made available to booth lessees, which reads:

> The Board reserves the right to remove from the grounds any exhibit that may be falsely entered, or may be deemed unsuitable or objectionable, or to remove any signs, banner or advertising matter of any kind which may be deemed unsuitable or objectionable by them without assigning any reason therefor.

(1992 Fair Premium Book ¶ 24.) In addition, "[t]he Board reserves the right to reject all articles which are offered for exhibit simply as a means of advertising or that are objectionable to Fair patrons." (*Id.* ¶ 7.) Finally, the Premium Book includes this language: "The Salt Lake County Fair, Inc., management reserves to its board the final absolute right to interpret these rules and regulations and to settle and determine all matters, questions and differences in regard thereto, or otherwise arising out of, connected with or

incidental to the Fair. The decisions of the Fair Board will be final." (*Id.* ¶ 1.)

Plaintiff Mood For A Day, Inc., describes itself as an "educational corporation teaching the public about the use of hemp." (Amended Complaint ¶ 4.) Its original articles of incorporation state that its corporate purpose is to "hold Educational Seminars and Programs concerning Marijuana." (Art. of Inc., art. III, Plaintiff's Exh. c). Its articles of amendment changed the corporate purpose to state, in part: "The purpose of Mood For A Day is to hold Educational Seminars and Programs concerning the industrial and agricultural uses of hemp, traditional hemp culture, and ecologically safe methods for the manufacture of industrial commodities such as paper and plastics." (Articles of Amendment dated Feb. 17, 1992, Amendments I.a, c, Plaintiff's Exh. c.) The articles of amendment also recognize that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation." (*Id.* Am. I.f.)

In July 1992, Mood For A Day entered into a lease agreement with Salt Lake County Fair, Inc., for a booth at the 1992 County Fair. One of Mood For A Day's representatives, Maury Modine, signed the agreement on behalf of the organization. The agreement ran for the duration of the Fair, August 10–15, 1992. The lease agreement reads, in part: "The Salt Lake County Fair, Inc. shall have full interpretation, amendment and enforcement of all conditions, rules and regulations, including all articles for sale or distribution." (Lease Agreement, Plaintiff's Exh. aa, ¶ 4 (spelling corrected).) The agreement also provides that "[e]xhibitors must conduct their activities within their leased area." (*Id.* ¶ 5.) Plaintiff had leased a booth the previous year and had operated it for the duration of the 1991 Fair without incident.

As the week of the 1992 Fair progressed, the Fair Board and its employees began receiving numerous complaints from Fair patrons about the plaintiff, its booth, and its activities. Patrons complained that the booth was promoting illegal drug use and the legalization of marijuana to minors. Patrons

---

**2.** To date, there have been no complaints about banning politicians.

also complained that plaintiff's representatives were leaving their booth, distributing their materials at varied locations on the grounds, stopping young people outside of their booth in an effort to distribute their materials, aggressively approaching patrons, and blocking the walkway. Patrons also complained about the "obscene" content of materials being sold from the booth; about foul and abusive language in and around the booth; and about groups of "young toughs" and "unsavory looking characters" hanging around the booth. (Fair Board's Amended Answers to Interrogatories ¶¶ 28–29, 49(c); Affidavit of Gene Fullmer.)

Fair Board employees fielded these complaints and observed the activities of Mood For A Day firsthand. (Gene Fullmer Aff. ¶¶ 1–5; Affidavit of Karen Fullmer ¶¶ 1–4; Cameron Depo. at 49–50.) On Tuesday or Wednesday, August 11 or 12, defendant Grace Cameron observed plaintiff's representatives distributing materials outside the booth. Cameron approached one of plaintiff's representatives and informed him he was not allowed to distribute information outside the booth area. Cameron did not identify herself as a Fair employee. Plaintiff's representative ignored her admonition. (Cameron Depo. at 52–54; Fair Board's Am. Answers ¶ 34.)

Plaintiff's booth contained a variety of materials. Hanging in plaintiff's booth and stacked up for distribution were signs or bumper stickers that read, "Thank You for Pot Smoking." Plaintiff sold T–shirts that read, "If You Don't Smoke Pot You Have Shit For Brains" and "Urine Testing Really Pisses Me Off." Plaintiff distributed a newsletter titled "You Just Wanna Get High." Plaintiff had another handout titled "How Dangerous is Marijuana ... in Comparison to Other Substances?" Other handouts in the booth extolled the benefits of marijuana and hemp and contained representations of marijuana plants and leaves.

As complaints mounted, the Fair Board determined it must do something. On the evening of Thursday, August 13, 1992, defendant Mike Douglas, the Fair Board member in charge of booths, approached plaintiff's booth. He confronted Robert Waldrop, a representative of plaintiff working in the booth, and informed Waldrop that he was offended by the contents of the booth. (Plaintiff's Facts ¶¶ 61–62.) Douglas picked up a stack of the "Thank You for Pot Smoking" bumper stickers and said he was taking them as "evidence." That same evening, defendant Gene Fullmer watched the activities of plaintiff and reviewed plaintiff's literature.

At 10:30 or 11:00 that evening, the Fair Board convened an emergency meeting to discuss the problems raised by plaintiff's booth. (See Smith Depo. at 27.) Present were defendants Mike Douglas, Roene Wood, Darrell Smith, and Grace Cameron. Defendant Gene Fullmer participated by telephone. There was some discussion about the "problems" associated with plaintiff's booth, although the record is incomplete as to what exactly was said. The members of the Fair Board "didn't think [the] T–shirts were appropriate for a kids Fair." (Cameron Depo. at 59.) In addition, they noted that plaintiff was selling T–shirts even though it had not signed up to do so. (Id.) The Board also discussed plaintiff's activities outside its booth space. (Id. at 59–60.) The Board focused on the materials in plaintiff's booth as well and concluded that plaintiff was promoting illegal drug use. (See, e.g., id. at 60; Gene Fullmer Aff. ¶¶ 1–3, 5.) During the meeting, the Board called Gene Fullmer at home and asked whether he would be for or against closing the booth "due to all the complaints." He voted that the Board should close Mood For A Day's booth " 'because they deceived us about their purpose in the first place, and due to the complaints we have received.' " (Gene Fullmer Answers ¶ 36(d).) At the conclusion of the ad hoc meeting, the members of the Board present decided to terminate the booth.

Douglas subsequently returned to plaintiff's booth and informed Waldrop of the Board's decision. (Affidavit of Robert Waldrop ¶ 14; Fair Board's Am. Answers ¶ 31.) Douglas told plaintiff the Board was terminating its booth based on the booth's offensive content and on the fact that plaintiff was "promoting narcotics." (Waldrop Aff. ¶ 15.) The Fair Board conveyed a similar message that evening to the telephone answering ma-

chine of Maury Modine. (Affidavit of Maury Modine ¶¶ 12–13.) Plaintiff claims Douglas also informed Modine he was terminating the lease because Waldrop had been rude to Douglas. (*Id.* ¶ 12.)

Douglas told Waldrop to have Modine meet him in his office at 9:00 a.m. the next morning. Modine arrived the next morning and Douglas explained to him the reasons the Fair Board was terminating the lease. Modine left the office and returned approximately 30 minutes later with his attorney. Douglas again explained the Fair Board's position and arranged for plaintiff to receive a refund of the $200.00 plaintiff had paid for the booth. (Fair Board's Am. Answers ¶ 31.) Douglas informed Modine that plaintiff was not to return to the Fairgrounds that day and that if it did, officers from the Salt Lake County Sheriff's Department would forcibly remove plaintiff's representatives from the grounds. (Modine Aff. ¶ 15.) Douglas also informed plaintiff it would not be allowed to rent a booth for the 1993 Fair. (*Id.* ¶ 16.) Modine met later that day with Salt Lake County Commissioner Jim Bradley and asked him to reverse the decision. Bradley promised to look into the matter. (*Id.* ¶ 7.)

Plaintiff submits that it operated its 1992 booth in the same manner as it had its 1991 booth. (*See, e.g., id.* ¶ 8; Plaintiff's Second Mem. in Supp. of S.J. ¶ 2.) Defendants deny this contention. (*See* Defendants' Response to Plaintiff's Second Mot. for S.J. ¶ 2.) However, defendants admit they do not know what items plaintiff distributed in 1991 and did not receive complaints about the conduct of plaintiff in 1991 as they did in 1992. (*See* Defendants' Statement of Uncontr. Facts ¶ 57.)

---

3. That decision was based on facts demonstrating the county's involvement with the Fair which are not set forth in this opinion. (*See generally* Plaintiff's Statement of Undisp. Facts.) The primary evidence supporting a finding of state action is the association, apparent and real, between Salt Lake County and the Fair. It is indisputable that the Fair bears the county's name, is located in part on quasi-public property, and, at the time of the events here in question, enlisted the support of the Salt Lake County Commissioners as ex-officio members of the Fair's Board of Directors. Accordingly, the court found the Fair Board and the individually

## PROCEDURAL HISTORY

Plaintiff subsequently filed this action under 42 U.S.C. § 1983 against Salt Lake County, Salt Lake County Fair Board, Inc., and individual defendants Douglas, Fullmer, Wood, Smith, and Cameron. Plaintiff alleges violation of its free speech and due process rights under the First, Fifth, and Fourteenth Amendments. Plaintiff attaches a pendent free speech claim under the Utah State Constitution. Plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, and attorney's fees and costs.

On earlier motions for summary judgment, this court determined that defendants acted under color of state law for purposes of plaintiff's § 1983 claim and that Salt Lake County could be liable for the alleged constitutional deprivations.[3] Plaintiff has now moved for summary judgment on its free speech and due process claims. Defendants oppose plaintiff's motion and move respectively for judgment as a matter of law on each claim.

## ANALYSIS

### I. Plaintiff's First Amendment Claim

### A. The Nature of the Speech

United States Supreme Court jurisprudence recognizes that certain categories of speech are not entitled to the protection of the First Amendment. These categories include obscenity,[4] "fighting words" likely to provoke retaliation,[5] and incitement of imminent lawless action.[6] Defendants concede that the speech at issue did not amount to fighting words or legal obscenity.[7] They

---

named defendants were state actors for purposes of this suit.

4. *See Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973).

5. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

6. *See Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969).

7. Despite defendants' evidence that Fair patrons complained of "obscene" materials in plaintiff's booth, defendants accurately recognize that the

contend, however, that plaintiff's speech advocated lawless action and was therefore outside the jurisprudential bounds of the First Amendment. To the extent defendants argue that plaintiff's speech incited "imminent" lawlessness, the court disagrees.

■ To fall within the "imminent lawlessness" class of speech, the words at issue must be directed toward inciting *imminent* lawless action and likely to produce such *imminent* action. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969). Even if plaintiff's booth advocated illegal drug use, there is no evidence in the record to show an imminent threat of drug use at or near plaintiff's booth. It is not enough under this analysis that plaintiff's message could be read to advocate breaking the law at some later time. *See Hess v. Indiana*, 414 U.S. 105, 108–09, 94 S.Ct. 326, 328–29, 38 L.Ed.2d 303 (1975).

Defendants argue further, however, that plaintiff's booth at the county fair could be banned by the Fair Board because it solicited illegal activity. Defendants cite as support for this proposition the decisions in *Record Revolution No. 6, Inc. v. City of Parma*, 492 F.Supp. 1157 (N.D.Ohio), *rev'd*, 638 F.2d 916 (6th Cir.1980), *vacated*, 451 U.S. 1013, 101 S.Ct. 2998, 69 L.Ed.2d 384 (1981) and 456 U.S. 968, 102 S.Ct. 2227, 72 L.Ed.2d 840 (1982), *aff'd*, 709 F.2d 534 (6th Cir.1983); *Murphy v. Matheson*, 742 F.2d 564 (10th Cir.1984); and *Pleasant v. Lovell*, 876 F.2d 787 (10th Cir.1989).

*Record Revolution* held constitutional a state statute regulating the sale and distribution of drug paraphernalia. The decision based its holding in large part on the Supreme Court's decision in *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

In *Pittsburgh Press*, the Supreme Court sustained an ordinance forbidding a newspaper from advertising job openings under "male interest" and "female interest" headings because local law prohibited employment discrimination based on gender. After finding that the speech at issue was commercial speech, the Court determined further that it proposed *illegal* commercial activity under local law and could therefore be regulated and suppressed. 413 U.S. at 388, 93 S.Ct. at 2560. The Court based its holding squarely on the illegality of the proposed transaction, recognizing the commercial nature of the speech in question: "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id.* at 389, 93 S.Ct. at 2561.[8]

■ Although defendants contend otherwise, the undisputed facts of this case show plaintiff's speech was not commercial in nature. *Pittsburgh Press* is therefore not directly on point and is not controlling.[9]

---

T-shirts and literature at issue were not "obscene" in the legal sense, as defined by the Supreme Court. *See Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**8.** At the time *Pittsburgh Press* was decided, the Supreme Court afforded commercial speech no First Amendment protection. *See Valentine v. Chrestensen*, 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942). The *Pittsburgh Press* Court considered whether to overrule *Chrestensen* and afford commercial speech a higher level of protection. *See* 413 U.S. at 388, 93 S.Ct. at 2560. However, because of the illegal character of the commercial speech, the Court found it unnecessary to reach the question. *See id.* The Court later overruled *Chrestensen* and gave commercial speech some First Amendment protection in *Virginia State Board of Pharmacy v. Virgi-*

*nia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Even so, the *Pittsburgh Press* decision retained its viability. *See id.* at 772, 96 S.Ct. at 1831; *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 563–64, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("The government may ban ... commercial speech related to illegal activity.") (citing *Pittsburgh Press*); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495–96, 102 S.Ct. 1186, 1191–92, 71 L.Ed.2d 362 (1982) (commercial speech encouraging illegal drug use may be banned entirely) (citing *Pittsburgh Press*, *Central Hudson*).

**9.** Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v.*

Despite the apparent clarity of the commercial/noncommercial distinction in *Pittsburgh Press*, the *Record Revolution* court cited *Pittsburgh Press* for the proposition that "speech, *commercial or otherwise*, which solicits illegal activity is not protected by the First Amendment." 492 F.Supp. at 1178 (emphasis added). This appears to be an interpretation of the law not directly addressed by the United States Supreme Court. In this regard defendants also cite dicta from the Tenth Circuit which also fails to make the commercial/noncommercial distinction. *See Pleasant v. Lovell*, 876 F.2d at 790 ("While ... political speech ... is protected by the first amendment, the same is not true of speech encouraging or facilitating illegal activity.").

■ In deciding whether plaintiff's noncommercial speech in the context of the County Fair is or is not protected under the First Amendment, the court finds no direct precedent from the United States Supreme Court, the Tenth Circuit Court of Appeals, any other federal court of appeals or any other federal court decision. The court finds the rationale of *Pittsburgh Press* helpful. There the high court stated, "[W]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." 413 U.S. at 388, 93 S.Ct. at 2560. Similar logic would allow a state to constitutionally forbid a participant in a state-sponsored event such as a county fair from advocating the use of illegal drugs, an action which experience tells us necessarily involves the purchase and sale of the drugs.

This is not inconsistent with *Brandenburg v. Ohio*. *Brandenburg* involved a "rally" held on private property, a farm in Hamilton County, Ohio. The Court made it clear that in non-public places the Ku Klux Klan can go so far as to advocate the use of force against citizens of a different race, and the state may not ban them from doing so unless lawlessness is imminent. The instant case of course does not involve private property. This case poses the question whether noncommercial speech advocating law-breaking activities uttered on public property at a state-sponsored event may be banned. This court believes the correct constitutional result is to find that such speech is not protected under the First Amendment and therefore may be restricted or banned by the state. It is inconsistent with the concept of our organized republic not to allow the state the right to ban the advocacy of breaking the state's criminal laws at the state's own event, especially an event that is sponsored for the purpose of promoting a family oriented, wholesome, lawful activity. It is one thing for the state to reach into private premises and impose content-based controls on speech, as in *Brandenburg*, or for the state in either a public or a private setting to forbid the advocacy of changing the law or any other expression, but it is quite another proposition for the state to be forced to allow at its own events the open advocacy not of changing its laws but of breaking its existing criminal statutes.

By opening up its property to a county or state fair the state does not automatically provide a forum where anyone may erect a booth stating, for example, "Build an illegal pipe bomb—Here's how!" or "Rob your neighbor's house for fun and profit." By being involved with the event the state has put its imprimatur on the event's activities. It makes no more sense to forbid the state from banning this narrow category of speech advocating illegal behavior at state-sponsored

---

*Public Service Common*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980). It does "no more than propose a commercial transaction." *Pittsburgh Press*, 413 U.S. at 385, 93 S.Ct. at 2558. Noncommercial speech does not become commercial speech simply because it involves the solicitation of donations or is sold for a profit. *Id.* at 384–85, 93 S.Ct. at 2558–59; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976). The plaintiff's signs, slogans, T-shirts, bumper stickers, and handouts were not advertisements aimed at getting passersby to buy marijuana from the plaintiff. Rather, they conveyed noncommercial messages regarding marijuana. Even viewed in the light most favorable to defendants, the slogans at issue encouraged smoking pot, not buying pot from the plaintiff. Such speech is noncommercial even though Fair patrons may have given plaintiff money to purchase the T-shirts or made other donations or purchases. The Fair Board's cases are distinguishable.

events than it does to forbid a state from passing a law that newspapers may not carry advertisements that propose illegal transactions, a law found constitutional in *Pittsburgh Press.*

■ Accordingly, the court finds that if the plaintiff advocated breaking the drug laws and if the state expelled the plaintiff from the 1992 Fair for that reason, the Fair Board's action was constitutional. The inquiry in this regard is thus one of fact. The jury in this case will be asked whether the plaintiff's booth in fact advocated breaking the law, as the defendants insist, or merely advocated changing the law, as plaintiff insists. If the former, and if that was the basis for the plaintiff's expulsion, there was no violation of the plaintiff's civil rights. If the latter, or if the plaintiff was thrown out of the fair for some content-based reason other than its advocacy of breaking the drug laws, the plaintiff's civil rights may have been violated.[10]

*B.  Nature of the Forum*

■ The County Fair in this case is a limited use public forum. See *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 655, 101 S.Ct. 2559, 2567–68, 69 L.Ed.2d 298 (1981). The Supreme Court has recognized three distinct "forums" for purposes of First Amendment Free Speech analysis: 1) Traditional public forums: "places which by long tradition or by government fiat have been devoted to assembly and debate," such as public streets and parks; 2) Designated public or limited public forums: "public property which the State has opened for use by the public as a place for expressive activity," such as school board meetings or municipal theaters; and 3) Nonpublic forums: "[p]ublic property which is not by tradition or designation a forum for public communication," such as military bases or post offices. *Id.* at 45–46 & n. 7, 103 S.Ct. at 955 & n. 7 (and cases cited therein).

In the first two forums if the speech in question is protected under the First Amendment, "the rights of the State to limit expressive activity are sharply circumscribed." *Id.* at 45, 103 S.Ct. at 954. "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.*

In the last category, the so-called "nonpublic" forum, in contrast, "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an

---

**10.** To the extent plaintiff argues that United States Supreme Court precedent requires summary judgment in plaintiff's favor, the court disagrees. The decisions in *Pittsburgh Press, Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *Brandenburg, Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and *Hess,* are helpful and instructive. Indeed, the totality of the holdings of those cases is an important basis for the court's decision in the instant case.

In *Widmar, Hess, Brandenburg,* and *Perry,* the United States Supreme Court speaks of the distinctions between the various categories of "public" property and states in the context of those cases that on any type of public property content-based prohibitions by the state are not allowed unless a compelling state interest test is met. But none of those cases addressed or decided the precise issue under consideration here. The question here is whether a content-based ban on speech advocating illegal conduct uttered on limited use public property is violative of the Free Speech clause. This court addresses that question directly, as is its task. An overly formalistic analysis could lead to a trap where the only justification for the state's action would be if the state could establish that it met a compelling state interest in enforcing the ejection of the plaintiff's booth. But such an approach would read more into precedent than exists. It would place form over substance. It would impose a detailed, expensive and time-consuming strict scrutiny exercise in this and every case where a speaker urges patrons at a county fair or other similar public-sponsored event to break the law.

This court sees that as unnecessary and unwise. The holding here is straightforward and unremarkable. A speaker has no constitutional right to advocate breaking the state's criminal laws at the state's own limited purpose event on public property. The same speaker may do so on non-limited use public property, as in *Hess,* and on private property, as in *Brandenburg,* but not on limited-use public property such as the county fair in this case. Having read and re-read the dicta and holdings of the foregoing cases, this court is satisfied that the United States Supreme Court has never answered this question, and that the decision here reached is in harmony with the Court's precedents and with the First Amendment.

effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46, 103 S.Ct. at 955. "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981) (quoting *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216–17, 47 L.Ed.2d 505 (1976) (quoting *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)))) (quotation marks omitted).

In any of these forums, "[t]he State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

Defendants argue that plaintiff's booth did not fit in with the agrarian purposes or wholesome family atmosphere of the Fair. In making this argument, defendants appear to be suggesting that the Fair fits the non-public forum classification and that they could reasonably exclude plaintiff because plaintiff's booth was inconsistent with the nature of the Fair.

It is undisputed that the history of the Fair shows one of its primary purposes is to provide a place to display livestock, agriculture, crafts, and the like in the setting of a family-oriented event. However, this is not a case in which plaintiff attempted to give its views on marijuana in the middle of a livestock display or in which plaintiff was excluded from the fine arts section. Rather, plain-

tiff leased a booth in an area to which the public generally had access to disseminate and receive a wide variety of information. No meaningful criteria existed for allowing certain types of booths or disallowing others, with the political candidate exception.[11]

Certainly, no criteria existed for limiting booth space to groups with agricultural themes. Booth space has been made available to such diverse, nonagricultural, nonrural groups as businesses, educational groups, vendors, fortune tellers, and church groups. (*See* Plaintiff's Facts ¶ 56; Cameron Depo. at 86–87.)

The 1992 Salt Lake County Fair was a limited public forum. It was open to the public for the limited purpose of participating in an entertaining and educational event and celebrating the achievements of members of the county. All of the evidence before the court shows that the Fair opened its grounds and allowed groups to come in, lease booth space, and communicate to the public, making it a limited public forum. The court sees no distinction between the 1992 Salt Lake County Fair and the Minnesota State Fair which was found by the United States Supreme Court to be a limited public forum for First Amendment analysis purposes in *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 655, 101 S.Ct. 2559, 2568, 69 L.Ed.2d 298 (1981) (the Fair "provede[d] means for a great number of exhibitors temporarily to present their products or views ... to a large number of people in an efficient fashion.") Accordingly, the defendants' argument that the plaintiff's booth did not meet the criteria of the Fair Board must fail. Still, as stated in the fore-

---

**11.** The undisputed facts show that defendants have regularly excluded political candidates and political parties from leasing booth space. (*See supra* text accompanying note 2.) Defendants attempt to argue that political messages of all sorts were excluded and that plaintiff's message was incompatible with the "nonpolitical" nature of the Fair. Plaintiff's counsel in fact refers in the record to the Fair's policy of excluding political "groups." (*See* Smith Depo. At 53.) Despite that isolated reference, the record in its entirety shows that groups which merely convey a message which is political in nature have not been regularly excluded. If in fact defendants can demonstrate that groups conveying any political

message have been regularly excluded from the Fair regardless of their viewpoint, the court leaves open to defendants the opportunity to show that plaintiff was removed from the Fair on that basis. Such a restriction is consistent with the definition of a limited public forum. *See Perry Education Ass'n,* 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7 ("A public forum may be created for a limited purpose such as use by certain groups for the discussion of certain subjects.") (citations omitted). Plaintiff has consistently argued throughout its briefs that it was delivering a "political message." (*See, e.g.,* Plaintiff's Second Supp. Mem. At 3, 14 & n. 9, 17, 18, 28; Plaintiff's Reply Mem. At 3, 23.)

going section, the state was free to expel the booth if it advocated illegal drug use.

## C. Compelling State Interest

■■■ This court has held that if the plaintiff's speech at the Fair advocated illegal conduct, the state was free to regulate or ban the speech, or not, as it chose. This holding decides the First Amendment question and no further discussion of a compelling state interest is required. However, given the current state of First Amendment free speech law and recognizing that the precise question at issue in this case has not been decided by the United States Supreme Court or the United States Circuit Court of Appeals for the 10th Circuit, the court feels compelled to state an alternative basis for holding that the state had the right to ban the speech in question if that speech did in fact urge Fair patrons to violate the law. That alternative ruling is based on the court's finding that even if the speech at issue was entitled to First Amendment protection, the state in the instant case had a compelling state interest in expelling the plaintiff's booth if the plaintiff's speech advocated illegal conduct. Analytically, the law in this regard is established. It requires a strict scrutiny analysis asking whether the state in banning the speech acted in accordance with a compelling state interest and whether the state achieved that interest in the narrowest possible way.[12]

Defendants make the obvious point that growing and using marijuana violate federal and state law. They point especially to the youth at the Fair and argue they had a duty to protect the youth from hearing a message advocating violation of the criminal law. They argue plaintiff's booth "exposed young children to the idea that it is legal to smoke marijuana, and that such young children should smoke pot or marijuana." (Fair Board's Am. Answers ¶ 4.)

The compelling nature of the state's interest in fighting illegal drug use can hardly be questioned. Congress, state legislatures, courts, and other government entities have long recognized serious societal problems associated with the use and abuse of controlled substances, including marijuana. *See, e.g.,* 21 U.S.C. § 841 *et seq.* (federal criminal penalties for manufacturing, distributing, dispersing, or possessing controlled substances); Utah Code Ann. § 58–37–1 *et seq.* (state criminal penalties); *Vernonia School District 47J v. Acton,* —— U.S. ——, ——––——, 115 S.Ct. 2386, 2388–89, 132 L.Ed.2d 564 (1995) (describing the "deleterious effects of drugs"); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding federal agency regulations implementing drug testing); *New Jersey v. T.L.O.,* 469 U.S. 325, 338, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) ("[D]rug use . . . in the schools ha[s] become [a] major social problem[ ]." (Citing 1 NIE, U.S. Dept. of Health, Education and Welfare, Violent Schools—Safe Schools: The Safe School Study Report to the Congress (1978)); *id.* at 357, 105 S.Ct. at 751 (Brennan, J., concurring in part, dissenting in part) ("[W]e can take judicial notice of the serious problem[ ] of drugs . . . that plague[s] our schools."); *State v. Creviston,* 646 P.2d 750, 754 (Utah 1982) (no error to allow prosecutor to refer in closing arguments of drug trial to the "problem that we have with drugs in our community"); *Wright v. State,* 670 P.2d 1090, 1116 (Wyo.1983) (Cardine, J., dissenting) ("[T]he effort mounted to deal with the drug problem is beneficial and one generally approved by

---

**12.** As a general rule, once a court engages in a strict scrutiny analysis, the state conduct at issue usually fails to pass constitutional muster. This standard is more often than not the death knell of the state actors' case. Decisions in which state action has met such a burden are few and far between. *See, e.g., Schirmer v. Edwards,* 2 F.3d 117 (5th Cir.1993) (free speech), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1396, 128 L.Ed.2d 70 (1994); *Vanderlinden v. Kansas,* 874 F.Supp. 1210 (D.Kan.1995) (equal protection); *Employment Division v. Smith,* 494 U.S. 872, 905, 110 S.Ct. 1595, 1614, 108 L.Ed.2d 876 (1990) (O'Connor, J., concurring) (free exercise of religion); *Blount v. Department of Educational & Cultural Services,* 551 A.2d 1377 (Me.1988) (free exercise of religion); *Rupert v. City of Portland,* 605 A.2d 63 (Me.1992) (state free exercise of religion). Nevertheless, if the compelling state interest standard means what it says, there must be room for cases which meet the standard. If not, then the judiciary must admit that mere invocation of the correct phrase talismanically disguises the *per se* nature of the inquiry, engaging the courts in a subterfuge unworthy of their constitutional role.

society."); *Record Revolution No. 6,* 492 F.Supp. at 1178 ("[T]he court is fully aware of the serious problems caused by rampant drug abuse....").

If there is any doubt as to the state's interest in stemming the drug problem, one need only look to state law. Besides outlawing the use, possession, and distribution of controlled substances, the Utah legislature has also made it a crime for any person to solicit, encourage, or intentionally aid another to do so. *See* Utah Code Ann. § 76–2–202. This criminal statute applies regardless where the message is relayed. Thus, defendants argue, plaintiff's representatives encouraged others to commit a crime—and arguably committed a crime themselves—when they set up a booth extolling the advantages of growing and using marijuana. (*See* Defendants' Mem. in Opp. at 2.)

The state's interest only intensifies when minors are involved. Defendants have submitted unrebutted testimony that a primary focus of the Fair is on children and that the Fair caters especially to youth ages nine to sixteen. (*See* Cameron Depo. at 55.) State actors have a compelling interest in protecting youth, especially in the areas of health, safety, welfare, and morals. *Cf. Ginsberg v. New York,* 390 U.S. 629, 636, 88 S.Ct. 1274, 1278–79, 20 L.Ed.2d 195 (1968) ("Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare, and morals of its community by barring the distribution to children of books recognized to be suitable for adults."); *id.* at 636–40, 88 S.Ct. at 1278–81 (state has heightened interest in protecting minors from pornography); *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens."). There is no question that drug use among minors was a major societal problem in 1992, as it is today.

The nature of the County Fair also plays into the equation. Plaintiff has succeeded in arguing that the Fair is a *state-sponsored* event. *See supra* note 3. Just as that fact was essential to this court's finding that plaintiff's speech (to the extent it advocated illegal activity) was not entitled to First Amendment protection, it also emphasizes the compelling nature of the defendants' interest.

Everything about the Fair has the imprimatur of the county on it. As plaintiff convincingly laid out for the court in an earlier motion, the Fair enjoys county funds, county law enforcement, county property, county commission involvement, and other municipal benefits. Moreover, the Fair is widely perceived as the county's fair, as its name implies. The facts of this case show actual county involvement at many levels. Taken together, these facts reinforce the county's express and implied responsibility for the Fair. Consequently, the county may fairly be held accountable for goings-on at the Fair, at least from the point of view of the general public.

It is little wonder, then, that the record reflects some outrage directed at the state actors for the contents of plaintiff's booth. The record shows Fair patrons complained continually to the Fair front office and the individual Fair Board officials. One patron charged the Fair with "help[ing] promote the use of an illegal substance" (Cameron Depo. at 49), pinpointing the concern expressed generally by the other complaining patrons and illustrating the nature of the state's interest. (*See* Karen Fullmer Aff. ¶ 4.)

The state has a compelling interest in suppressing speech that advocates breaking the state's criminal laws at a state-sponsored event. This is true in the instant case regardless of the Utah statute criminalizing the encouragement of a crime. While the First Amendment may not allow a state to randomly suppress speech advocating non-imminent illegal conduct on private property, or in traditional public forums, such as the sidewalk in *Hess, supra,* the Constitution conversely does not require a state to facilitate such speech at its own activities. This is the primary basis for the court's earlier holding that speech advocating illegal conduct at a state-sponsored fair is not entitled to First

Amendment protection. The county would undoubtedly have a similar compelling interest in prohibiting individuals at the Fair from demonstrating how to make illegal home bombs; from giving "how-to" tips for cheating on taxes; or from distributing materials advocating gang violence.

This recognition of a compelling state interest does not destroy the freedom the plaintiff's representatives have in this country to speak their mind in a large variety of places. Assuming plaintiff complies with lawful requirements, plaintiff is free to deliver its message in other ways: it may hold a rally on private property, and certain types of public property, place its bumper stickers on cars and trucks, or hang its posters and wear its T-shirts. Each of these communicative methods would probably deprive the state of the compelling interest which arises from the special nature of the state-supported and state-sponsored Fair.

The state has a separate, equally compelling interest in protecting minors from hearing a pro-drug use message at the Fair. The undisputed facts in this case show that many youth attended the Fair, that the Fair had an emphasis on youth, that youth were heavily in the area of plaintiff's booth, and that plaintiff was recruiting youth to help deliver its message. Furthermore, defendants claim to have rested their decision to terminate plaintiff's booth largely on the fact that youth were exposed to the message. Defendants have persuasively argued that "[d]istribution of such information to children and teenagers promotes the use or cultivation of a controlled substance without warning these persons that such use is a crime for which they can be severely fined, i[m]prisoned or both. It was this conduct by plaintiff and the numerous complaints by Fair patrons which precipitated expulsion of plaintiff by the Board of Directors." (County Fair, Inc.'s Statement of Facts ¶ 60.)

In sum, defendants have pointed to compelling interests that necessitated taking action against the plaintiff at the 1992 Fair. Taken alone or in the aggregate, the identified interests meet the first prong of the strict scrutiny test.

Plaintiff can hardly contend that defendants have not articulated compelling interests, and indeed it does not venture to do so. Rather, plaintiff advances two arguments against defendants' position: first, plaintiff was not advocating the use of marijuana— only its legalization and other, strictly legal uses of hemp; and second, defendants have not shown how they narrowly tailored their restriction to serve their compelling interests.

### 1. The Message of Plaintiff's Booth

Plaintiff first suggests it never advocated breaking the law. Rather, plaintiff characterizes its materials in a variety of ways, mostly as satire and parody. Plaintiff argues, for instance, that its speech "is really a call for the decriminalization of marijuana through legal means which relies on parody and political and philosophical persuasion." (Plaintiff's Second Mem. at 12.). Elsewhere, plaintiff argues that "the materials promote political change through legal means, contain factual information and express ... political opinions." (Plaintiff's Reply at 19, 29.) The T-shirts likewise "point[ ] out social developments which are arguably anti-libertarian and culturally biased. These statements challenge mainstream beliefs with humor and controversial words." (*Id.* at 19–20.) And the "Thank You For Pot Smoking" sign, a "parody of the Cancer Society request 'Thank you for not smoking,'" "does not advocate illegal activity, but instead highlights the irony of a social and political structure which legalizes tobacco use, an addictive habit which kills 340,000 to 425,000 United States citizens a year, but criminalizes marijuana, a drug which is related to few, if any, deaths." (*Id.* at 20.) "Through parody and offensive and shocking language, MFAD conveys their strong feelings against government intervention into the private affairs of its citizens and the government's double standard of leaving some extremely dangerous drugs essentially unregulated while criminalizing other drugs which seem relatively harmless." (Plaintiff's Second Mem. at 17.)

Defendants, in contrast, view plaintiff's materials as clearly advocating breaking the law. Defendants argue that the same mate-

rials plaintiff describes as innocuously political in nature unequivocally promoted and encouraged the committing of criminal acts, namely the growth and use of marijuana, especially to minors. (Defendants' Statement of Uncontr. Facts ¶ 78.) Defendants argue the newspaper, leaflets, and bumper stickers handed out by plaintiff at the Fair promoted the illegal growth and use of a controlled substance. (Defendants' Mem. in Opp. at 13.) "[M]ost of the newspapers and written handouts of plaintiff portrayed marijuana or hemp as a great savior for the country and promoted its use and its cultivation, while never once mentioning the fines or prison sentences to be meted out for such illegal conduct." (*Id.*)

These two opposing characterizations are wholly inconsistent. The court has carefully reviewed the materials in question and concludes that the parties have identified a material fact issue which must be resolved by a fact finder. The literature leaves room for argument on both sides. The parties are making essentially factual arguments based on the materials, which a reasonable jury could determine in favor of either side.

A brief look at each of the materials in plaintiff's booth shows there is indeed a fact question as to the message the booth conveyed.

"Thank You For Pot Smoking." Plaintiff argues this bumper sticker is nothing more than a parody of the American Cancer Society slogan. Defendants argue this message clearly tells the reader "Smoke Pot," and thanks him for breaking the criminal law.

"If You Don't Smoke Pot You Have Shit for Brains." Plaintiff describes this message as "strong and controversial," designed to provoke the reader to thoughtfulness about the current status of marijuana as an illegal drug. Defendants argue this message is more likely to encourage an impressionable reader to smoke pot than to engage in political or philosophical processes.

"Urine Testing Really Pisses Me Off." Plaintiff argues it is exposing the public to non-mainstream ideas to challenge and educate the public about drug laws. Defendants describe this message as encouraging resistance to lawful drug testing.

"You Just Wanna Get High." Plaintiff argues this is not what Mood For A Day stands for, but rather what the public *perceives* it stands for. Plaintiff argues that the literature in question answers critics' contentions on this point. "[T]he 'Get High' article merely advocates the decriminalization of marijuana." "[T]he title actually refers to remarks made *about* MFAD rather than statements endorsed by MFAD itself." (Plaintiff's Reply at 21.) Defendants suggest the title *is* the message, and that the small, jumbled print that follows is lost on the passersby or the average reader, especially the young ones.

"How Dangerous is Marijuana in Comparison to Other Substances." Plaintiff argues this handout is "an informational comparison of the dangers of marijuana with other substances, complete with citations to a federal government study." (*Id.* at 20–21.) Defendants argue that the handout suggests readers should smoke the drug because it is not that harmful when compared with legal substances.

Plaintiff points to the remainder of the literature, which it claims focuses on legalization of marijuana and economic benefits of hemp. Defendants point to that same literature and emphasize the drawings of marijuana plants and other drugs and the advocacy of growing, possessing, distributing, and using marijuana.[13]

As stated earlier, these competing characterizations present an issue of fact. The evidence viewed in a light most favorable to defendants would easily allow a reasonable jury to conclude that plaintiff's materials advocated breaking the law. The explicit and implicit messages of the booth are epitomized in the materials, "Thank you for pot smoking," "If you don't smoke pot, you have shit for brains," and "You just wanna get high."

---

**13.** These include statements such as "pRAISE HEMP"; "Hemp is America's Most Versatile Cash Crop"; "Be An Active Hempster"; and "[Marijuana] is used for medical, social, religious, and relaxational reasons. A number of American Presidents have smoked it, and it is popular with a wide social spectrum, including artists, musicians, activists and working people."

These are only examples of the central theme and overall message of the booth: "Smoke Pot." Plaintiff can hardly argue against that point when viewing the materials in the light most favorable to the defendants. In fact, in advancing its arguments regarding protected speech, plaintiff argued that, "[a]t 'worst,' statements such as 'Thank you for pot smoking' and 'We just want to get high,' 'amounted to *nothing more than advocacy of illegal action at some indefinite future time.*'" (Plaintiff's Second Mem. at 12 (quoting *Hess v. Indiana,* 414 U.S. at 108, 94 S.Ct. at 328–29) (emphasis added).) [14]

Despite the apparent frailty of plaintiff's position, a reasonable jury could find, as plaintiff has argued, that plaintiff was using literary devices such as hyperbole, satire, and shock value to make its point that society should change the way it treats marijuana. Viewing the materials in the light most favorable to plaintiff, defendants had no choice but to allow the message, offensive as it may have seemed.

If the jury agrees with plaintiff's characterization of its materials, defendants lose. State actors do not have a compelling interest in suppressing speech that advocates changing the law, even in the sensitive area of drug use, and even at this state-sponsored event.[15] Plaintiff's message in that instance may actually coincide with the state's compelling interest in addressing the difficult drug problem and, of course, the state may not discriminate based on viewpoint. If, on the other hand, the jury agrees with defendants as to the message of plaintiff's materials, then defendants had compelling reasons for evicting plaintiff from the Fair.

### 2. "Narrowly Tailored" Test

Plaintiff finally argues that even if defendants had a compelling reason to suppress speech advocating illegal drug use, they have made no showing that they narrowly tailored their response. It is undisputed that defendants' response to plaintiff's materials in this case was to terminate the booth. The question is whether defendants could have more finely tuned their response to avoid suppressing protected speech.

The "narrowly tailored" prong of the inquiry is very often the tripping point in the strict scrutiny analysis. Even if a state actor can meet the difficult burden of identifying action necessary to further a compelling interest, the means employed are often more than essential to achieve that interest. In the instant case, in contrast, the means employed are what the case is all about: whether plaintiff had access to the Fair as a communicative forum. Plaintiff, presenting the message it did, was either in or out, depending on the state interest and the booth's message. As the Supreme Court has noted, "[i]n a public forum, by definition, all parties have a constitutional right of access and the State must demonstrate compelling reasons for *restricting access* to a single class of speakers, a single viewpoint, or a single subject." *Perry Education Ass'n,* 460 U.S. at 55, 103 S.Ct. at 960 (emphasis added). Implicit in that statement is recognition of the narrow means a state actor would necessarily employ under facts such as these to meet its compelling goal.

■ The terminating of plaintiff's booth was, in a practical sense, the most narrowly tailored avenue defendants had open to them. If no right to have a booth existed in plaintiff because of compelling state interests to the contrary, the only practical alternative was termination. Nothing in the First Amendment or in the cases required defendants under the facts of this case to wade through the materials in plaintiff's booth, suppressing some items while allowing others, or blotting out portions of the handouts. This would, in fact, have been *more* intrusive and less respectful of First Amendment rights.

The facts of this case show the defendants observed the activities of plaintiff's booth, examined the literature, viewed the T-shirts

---

**14.** As support for the fact that plaintiff did not encourage illegal conduct, plaintiff states that "[t]he smoking of marijuana has been decriminalized in several of the United States." (Plaintiff's Reply at 29 n. 15.) This point, if accurate, is largely irrelevant in Utah, where the smoking of marijuana is unlawful.

**15.** This assumes, of course, that the forum was open to political speech. *See supra* note 5.

and bumper stickers, and spoke directly with plaintiff's representatives. Based on what they saw and read, defendants unanimously concluded that the overall message of plaintiff's booth advocated illegal drug use. If they were wrong about the message, then they acted at the risk of a later finding that they deprived plaintiff of constitutionally guaranteed rights. If, on the other hand, a jury agrees with their assessment, then they had every right to terminate the booth in pursuit of their identified compelling interests.

The facts viewed in the light most favorable to defendants suggest that all the materials in plaintiff's booth carried the same message, to a greater or lesser degree: use pot; smoke it, grow it, enjoy it. The record before the court purports to contain all the materials present in plaintiff's booth, either by way of description or by submission of photocopied literature. Without exception, the materials presented to the court, when viewed in the light most favorable to defendants, carry the message defendants say they do.

In sum, closing the booth was the most practical narrow means available to defendants under the facts of this case. If a jury agrees with defendants about the message of plaintiff's materials, then defendants did not commit a constitutional violation by closing plaintiff's booth because they narrowly tailored their necessary response to meet their compelling objectives.

In conclusion, material fact issues require a jury to make factual determinations before plaintiff's First Amendment claims may be finally adjudicated. Consequently, all motions for summary judgment on plaintiff's First Amendment free speech claim are denied.[16]

### D. The County's Motion for Summary Judgment

Salt Lake County has moved separately for summary judgment on the grounds that it

did not cause the alleged constitutional deprivations. Under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), the county cannot be held liable for the Fair Board's actions on a theory of respondeat superior. Instead, plaintiff must point to a policy or action of the county itself that is unconstitutional.

Plaintiff has pointed to the county's policy of leaving the Fair Board unfettered discretion to determine who may lease a booth at the Fair. That policy cannot be the legal cause of plaintiff's deprivation because it is not itself unconstitutional. By allowing the Fair Board discretion to regulate the Fair, the county did not in any way cause plaintiff to suffer a free speech deprivation. It is the action of the Fair Board and its members, actors clothed with state power for § 1983 purposes, that is at the root of plaintiff's complaint.

■ Plaintiff has also argued that the Fair Board's policy of arbitrarily determining who may lease a booth may fairly be imputed to the county. Plaintiff suggests the county has vested final policy-making authority for the Fair in the Fair Board. Under the cases, the policy would therefore be attributed to the county as its own and the county could be liable if the decision were found to be unconstitutional. *See, e.g., Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38 (When "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is unconstitutional, "the government as an entity is responsible under § 1983."); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (municipality may be liable for acts of officials with final policy-making authority).

This argument has merit as a matter of law. The Fair Board decided, based on content, that plaintiff could not remain in the

**16.** Plaintiff has also pursued a free speech claim under the Utah Constitution. The state's free speech clause reads simply, "No law shall be passed to abridge or restrain the freedom of speech...." (Utah Const. art. I, § 15.) The Utah Supreme Court has held in a free press case

that this provision is "at least as protective of these rights as the First Amendment." *KUTV, Inc. v. Conder,* 668 P.2d 513, 521 (Utah 1983). Accordingly, the court's ruling applies as well to plaintiff's state constitutional claims.

1992 Fair. The Board was the only representative of the county authorized to make that determination. Moreover, it is undisputed that the three county commissioners sat as Board members at the time of the incident in question. (Defendants' Statement of Uncontr. Facts ¶ 6.) As such, the Fair Board's policy vis-a-vis plaintiff in the instant case may fairly be attributed to the county as its own. *See Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir.1989) (police chief's decision to reprimand officers imputed to county). The county is therefore liable to plaintiff for any damages plaintiff may have suffered if it turns out that the Fair Board defendants' actions were unconstitutional.

### E. Immunity

Finally, the individual members of the Fair Board have raised a defense of immunity. This argument has not been fully briefed.[17] At a minimum, defendants have not shown that immunity of any type entitles them to judgment as a matter of law. Therefore, to the extent the individual defendants seek summary judgment on this basis, their request is denied. The question of qualified immunity is left open to exploration on further motions or at trial.

### II. Plaintiff's Due Process Claim

Plaintiff has also alleged a due process violation in connection with the events of the 1992 Fair. Plaintiff claims that it was not given notice nor any opportunity to defend its lease or respond to charges against it prior to termination of its lease on the evening of Thursday, August 13, 1992. Plaintiff claims this action deprived it of property without due process of law. (Am.Compl. ¶ 33.) In the present motion, plaintiff seeks summary judgment on this cause of action.

▆▆ Defendants argue in response that plaintiff waived its right to due process by signing the booth lease giving defendants full authority to interpret the contract and decide what would be appropriate at the Fair. The court disagrees. To find waiver, a fact finder must determine that plaintiff voluntarily and knowingly waived its constitutional rights. *See D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185–86, 92 S.Ct. 775, 782–83, 31 L.Ed.2d 124 (1972). Nothing in the record reflects such a waiver by the plaintiff. The lease agreement itself certainly does not satisfy that requirement. There is insufficient evidence to allow a reasonable jury to find waiver.

That puts the due process question squarely before the court. This is true, however, only because plaintiff has vigorously pressed this claim throughout its briefs. The facts of this case do not raise due process concerns. This case is about plaintiff's right to free speech at a government sponsored event. The due process claim under these facts is superfluous.

The Fourteenth Amendment ensures citizens that state actors will not deprive them of property unless the state first protects their interest through certain procedural safeguards. The thrust of the due process clause is procedural fairness to citizens to ensure that state actors deprive them of property only for reasons that are themselves legitimate. To suppose, however, that any procedure will allow a subsequent deprivation of a constitutionally protected right such as free speech is nonsensical: an unconstitutional deprivation is *never* proper and cannot therefore be cured by implementing prior procedural protections.

▆▆ Put simply, the right to free speech is not within the purview of interests implicated by the due process clause. Reduced to its essence, that is the interest at stake in this case. Depriving plaintiff of its booth lease was the equivalent of denying plaintiff access to a forum as a means of expression. Prior notice and a hearing would not have changed that fact. Plaintiff's right to bring this lawsuit on First Amendment grounds protects its free speech interest. The due process clause is a nonissue. Plaintiff's due process claim fails on that basis alone.

---

17. Defendants raised this argument for the first time in their final memorandum and again at oral argument. Because the individual defendants initially took the position they were not state actors, and because questions of immunity generally arise in cases involving constitutional allegations against state actors, the court will consider the argument.

Nevertheless, because plaintiff has continued to raise the point in its motion for summary judgment, the court will examine the arguments of counsel. Plaintiff submits that the "property" at issue in this case was not the free speech right but rather the Fair booth lease itself. Taking this argument at face value, assuming that is the bare interest at stake, and applying the standards for determining property interests, the court must agree. "Property interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Under Utah law, a contract or lease agreement such as the one at issue is a property interest entitled to due process protection.

However, the mere formation or existence of a contract between the parties does not necessarily foreclose the question. The court must examine the moment of the alleged deprivation to determine whether a property interest existed at that time. The inquiry is whether plaintiff had a "legitimate claim of entitlement" at the time of the alleged deprivation. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. That claim must be "specific and presently enforceable." *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559 (10th Cir.1993). As noted, state law defines the contours of that interest.

■ Under Utah law, a contract is not "presently enforceable" by a party in material breach. *See, e.g., Holbrook v. Master Protection Corp.,* 883 P.2d 295, 301 (Utah App. 1994) (and cases cited therein). Thus, if plaintiff was in material breach of the lease agreement, it had no right to enforce the agreement and therefore no protected property interest under state law.

■ The lease agreement in question gave the Fair Board the right to enforce all rules and regulations in its discretion, including the right to remove materials which were, in the Fair Board's judgment, "objectionable." The lease agreement also required plaintiff to distribute materials only from its leased booth space. Defendants have adduced undisputed evidence that plaintiff was in breach of both of these contract terms.[18] Based on these undisputed facts, reasonable minds could not differ, plaintiff was in material breach of contract. Under Utah law, plaintiff therefore "los[t] its right to enforce" the contract against the Fair Board. *See Holbrook,* 883 P.2d at 301. Plaintiff therefore had no protected property interest at the time its lease was terminated. *Cf. Gunkel v. City of Emporia,* 835 F.2d 1302, 1304–05 (10th Cir.1987) (under Kansas law, plaintiffs had no property interest in building permit issued by mistake or in violation of law).

Plaintiff argues, however, that the Fair Board never informed plaintiff it was in breach of contract or that it planned to terminate its booth until the booth was actually closed. Defendants respond that there was no such requirement in the contract and that § 1983 was never meant to bootstrap simple contract claims into civil rights actions.

■ To the extent plaintiff is arguing that notice and a hearing were required to hold it in breach of contract, plaintiff's claim fails as a matter of law. Where contract terms between a private entity and a government entity require the parties to perform in a particular way—the failure to do so amounting to material breach—neither the due process clause nor § 1983 graft implied terms of notice and a hearing into the contract. " 'Otherwise, virtually every controversy involving an alleged breach of contract by a government or a governmental institution or agency or instrumentality would be a constitutional case.' " *Casey v. Depetrillo,* 697 F.2d 22, 23 (First Cir.1983) (per curiam) (quoting *Jimenez v. Almodovar,* 650 F.2d 363, 370 (First Cir.1981)). State contract law

---

**18.** As already discussed in the free speech analysis and earlier in this section, removing plaintiff's booth from the Fair on these bases clearly implicates First Amendment concerns. However, that point is irrelevant to the present analysis. The inquiry here focuses solely on plaintiff's rights under the contract for purposes of determining whether defendants violated plaintiff's due process rights.

governs such agreements in the same way it governs agreements between private entities.

■ Plaintiff has not asserted a breach of contract claim, however. Due process challenges, as opposed to breach of contract claims, do implicate § 1983 when contracts between individuals and the state are at issue. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). But where a plaintiff alleges deprivation of a contract right without due process of law, the court may appropriately look to the contract between the parties to ascertain whether the plaintiff has a legitimate claim to entitlement under that contract. Here, the court has done so and finds such a legitimate claim lacking. *Cf. Roth,* 408 U.S. at 578, 92 S.Ct. at 2709–10 (no legitimate claim to entitlement in contract that had come to an end). Accordingly, plaintiff's due process claim fails as a matter of law for lack of an enforceable property interest.

■ Even if plaintiff's contract right were intact when its booth was terminated, however, the court finds as a matter of law based on the undisputed facts that defendants afforded plaintiff adequate notice of the reasons for terminating plaintiff and a fair opportunity to respond to the charges. The undisputed facts in plaintiff's own submissions, viewed in the light most favorable to plaintiff, show that late in the evening of August 13, 1992, defendant Michael Douglas, the Fair Board member in charge of booths, informed plaintiff that the Fair Board was terminating plaintiff's lease. One of the reasons Douglas gave plaintiff was that plaintiff's booth was "promoting narcotics." Douglas told plaintiff's representative Robert Waldrop of this reason face-to-face. That same evening, the Board left a message to the same effect on the answering machine of plaintiff's representative Maury Modine.

The next morning, August 14, 1992, Modine met with Douglas in Douglas's office at nine o'clock. At that point, Douglas reiterated essentially what he had told Waldrop the evening before. The parties met face-to-face. Modine had an opportunity at that time, having been informed in advance of the Fair Board's charges, to meet those allegations head-on with the individual responsible for leasing the booths. Furthermore, the undisputed facts show Modine returned half an hour later with his attorney to discuss the matter again. This was yet another opportunity to confront and dispel the allegations.

Finally, the undisputed material facts show Modine met yet again that day with Commissioner Bradley, a member of the Fair Board. Once again, Modine had the opportunity to make his case.

Based on these undisputed facts, plaintiff received adequate notice of the reasons the Fair Board terminated its lease and an adequate opportunity to respond thereto. Plaintiff's representatives knew of the complaints against it and had four face-to-face meetings with individuals directly involved in the Fair's operations at a time essentially contemporaneous to the lease termination. Under those facts, plaintiff's allegation that it was afforded "no meaningful pre- or post-termination hearing" is without merit.

"[I]t is fundamental that except in emergency situations ... due process requires that when a State seeks to terminate [a protected] interest ..., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971), *quoted in Roth,* 408 U.S. at 570 n. 7, 92 S.Ct. at 2705 n. 7. Plaintiff itself has characterized the Fair Board's action on the evening of August 13 as an "emergency meeting." (*See* Plaintiff's Second Mem. at v, ¶ 6.) The Fair Board acted *ad hoc* with the members it had present to consider a situation it viewed as serious and needing immediate attention. In *Parratt v. Taylor,* the Supreme Court held that its longstanding precedents "recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." 451 U.S. 527, 538–39, 101

S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981) (and cases cited therein). This was just such a case.

However, this is not a case where plaintiff never received an opportunity to be heard. Rather, the facts show plaintiff had a chance to respond that was essentially contemporaneous with, if not prior to, the alleged deprivation. The Fair was open to the public from 10:30 a.m. to 10:30 p.m. (*See* Plaintiff's Exhibit Re: Fair Hours.) The facts establish that the Fair Board met at 10:30 or 11:00 p.m. Douglas therefore informed plaintiff of the decision after the Fair closed to the public on Thursday. Plaintiff had the benefit of its lease all day Thursday. Plaintiff's representatives spoke with Douglas that evening and again early Friday morning before the booths reopened. Thus, plaintiff had the opportunity to respond before it was ever deprived of any booth time, the benefit it claims as property under state law and the basis for its damages claim.

Plaintiff argues, however, that defendants did not inform plaintiff prior to this lawsuit that it terminated plaintiff for breaching its lease agreement. The question raised by that argument is whether this lawsuit is an adequate hearing for due process purposes. In *Parratt v. Taylor,* the Supreme Court recognized a distinction between " 'a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers.' " 451 U.S. at 542, 101 S.Ct. at 1916 (quoting *Bonner v. Coughlin,* 517 F.2d 1311, 1319 (7th Cir.1975), *modified en banc,* 545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978)). " 'In the former situation the facts satisfy the most literal reading of the Fourteenth Amendment's prohibition against "State" deprivations of property; in the latter situation, however, even though there is action "under color of" state law sufficient to bring the amendment into play, the state action is not necessarily complete. For in a case such as this the law of [the state] provides, in substance, that the plaintiff is entitled to be made whole for any loss of property occasioned by the unauthorized conduct....' " *Id.*

The facts of the instant case are like the latter situation described in *Parratt.* Plaintiff has characterized the actions of the County Fair officials as "mis-conduct." (*See, e.g.,* Plaintiff's Facts ¶ 3.) Plaintiff's challenge is not to an established state procedure but rather to the actions of the Fair Board officials taken on the evening of August 13, 1992, actions which plaintiff deems inappropriate. Plaintiff had an adequate state remedy in the form of a contract action against the state. If the Fair Board improperly terminated plaintiff's booth, as plaintiff alleges, plaintiff could recover all of its damages through that means. As already noted, it is inappropriate to convert such a claim into a due process challenge.

In light of the conditions under which plaintiff's booth was terminated, this action provides plaintiff meaningful review of the termination on grounds that plaintiff breached its contract. Defendants have raised the issue by way of defense. (*See* Defendants' Amended Answer at 6 (Sixth Affirmative Defense).) Thus, plaintiff has had the opportunity to respond through counsel to each of the charges brought against it in a manner consistent with the due process clause as interpreted by the United States Supreme Court.

Because plaintiff has no "property" interest in free speech and no protected property interest in its booth lease at the time the lease was terminated, and because plaintiff was, at any rate, afforded adequate notice and an opportunity to respond to the charges against it, plaintiff's due process claim fails as a matter of law. For these reasons, individually and collectively, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted on plaintiff's due process claim.

## CONCLUSION

For the foregoing reasons, the court DENIES all parties' motions for summary judgment on the free speech claims. The court GRANTS defendants' motion on the due process claim and DENIES plaintiff's motion on that same claim. Counsel for the parties are

instructed to contact the court for a trial date at the earliest possible convenience.

IT IS SO ORDERED.