IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Grassy Meadows Sky Ranch<br>Landowners Association, | ) | OPINION |
| | ) | |
| | ) | Case No. 20100925-CA |
| Plaintiff and Appellee, | ) | |
| | ) | |
| v. | ) | F I L E D |
| | ) | (July 6, 2012) |
| Grassy Meadows Airport, Inc.; Sky | ) | |
| Ranch Development, Inc.; and Michael | ) | 2012 UT App 182 |
| O. Longley, | ) | |
| | ) | |
| Defendants and Appellants. | ) | |

-----

Fifth District, St. George Department, 030501171
The Honorable G. Rand Beacham

Attorneys:     Nathan Whittaker, Murray, for Appellants
               Gregory N. Hoole and John D. Richards III, Salt Lake City, for Appellee

-----

Before Judges Davis, Thorne, and Roth.

DAVIS, Judge:

¶1     Grassy Meadows Airport, Inc.; Sky Ranch Development, Inc.; and Michael O. Longley (collectively, Sky Ranch) appeal the trial court's ruling in favor of Grassy Meadows Sky Ranch Landowners Association (the Association). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

BACKGROUND

¶2      The Association is comprised of the lot owners of the Grassy Meadows Sky Ranch Development located near Hurricane, Utah.[1]  Many of the lot owners are private pilots or airplane owners who were attracted to this residential community because it is centered around a private airstrip.  The airstrip is owned by Grassy Meadows Airport and leased to the Association.  The lease "grant[s] the Association and its members, guests and invitees the exclusive right of use of the . . . [a]irport" for a ninety-nine-year term.  Sky Ranch also adopted a set of covenants, conditions, and restrictions in July 1990 (the 1990 CCRs) that applied to Sky Ranch and the Association.  The 1990 CCRs provided that Sky Ranch could unilaterally amend the CCRs for certain enumerated purposes "until eighty percent (80%) of the lots in the Development (including additional phases as may be added) have been sold to purchasers" (the 80 Percent Provision).

¶3      In November and December 2001, Sky Ranch appeared before the Washington County Planning Commission to request a zoning change that would allow the construction of a fixed based operation (FBO) within the development.  As described by Sky Ranch, the plans for the FBO included an on-site residence for the FBO operator, a large hangar to be used for aircraft maintenance, and ten to fifteen bed-and-breakfast-style lodging units to accommodate individuals interested in buying property at Grassy Meadows.  A representative from the Association appeared at both meetings to oppose the zoning request, which was ultimately denied.

¶4      By June 2002, 81.5% of the platted lots in the community had been sold, prompting the Association to write Sky Ranch a letter notifying it that its right to unilaterally amend the 1990 CCRs had terminated in accordance with the 80 Percent Provision.  Nevertheless, in October 2002, Sky Ranch unilaterally amended the 1990 CCRs with a new set of CCRs (the 2002 CCRs).  The 2002 CCRs contained provisions spelling out Sky Ranch's right to pursue the commercial improvements at issue in the zoning hearings and amending the voting rights of the different categories of lot

---

[1]In an appeal from a bench trial, we recite the facts in the light most favorable to the trial court's determination, "granting due deference to the trial court's resolution of factual disputes." *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 2, 70 P.3d 35 (internal quotation marks omitted).

owners, as well as several other provisions aimed at facilitating the development of a new planned community, Copper Rock, adjacent to the Grassy Meadows community. Michael Longley, the president of both Grassy Meadows Airport and Sky Ranch Development, is also behind the Copper Rock project and wanted "to open the traffic pattern and runway to visitors" of Copper Rock.

¶5   On March 31, 2003, several months after the CCRs were amended, the Association received a "Notice of Termination of Lease" from Grassy Meadows Airport alleging that the Association failed to properly maintain the airport, to abide by the terms of the CCRs, to meet the lease's insurance requirements, and to make lease payments on time. Despite the Association's attempts to remedy the alleged breaches, Grassy Meadows Airport terminated the lease on May 5, 2003.[2] Sky Ranch refused to take the payments the Association attempted to make under the lease after its termination. The Association subsequently deposited those funds into an escrow account.

¶6   The Association filed suit in June 2003. Sky Ranch responded with several counterclaims. The main issues presented at the two-day bench trial in April 2010 were (1) whether the 2002 CCRs were valid; (2) whether the Association breached the lease and, if so, whether Sky Ranch properly terminated the lease; and (3) whether the Association "tortiously interfered with the legitimate business interests of [Sky Ranch] by opposing proposed zoning ordinance changes affecting [the Association]." The trial court determined that the 2002 CCRs were "void *ab initio*" because Sky Ranch had lost its ability to unilaterally amend the 1990 CCRs when 81.5% of the lots were purchased, and that the lease termination was not justified because the Association did not materially breach the lease. Furthermore, the trial court dismissed Sky Ranch's counterclaim for tortious interference, stating, "[T]here [was] no basis to hold the Association liable . . . ." In light of these conclusions, the trial court determined that the funds held in escrow were to "be released to Defendant Grassy Meadows Airport . . . [and] applied as rent paid in full under the Lease."

---

[2]Although the lease was terminated, Sky Ranch has permitted the Association members to continue using "the runway the same as always as long as [the Association] maintains the necessary insurance coverage."

ISSUES AND STANDARDS OF REVIEW

¶7      Sky Ranch presents four issues for appeal.  First, Sky Ranch challenges the trial court's invalidation of the 2002 CCRs, which was based on the court's interpretation of a provision it deemed ambiguous in the 1990 CCRs.  Second, Sky Ranch contends that it was entitled to terminate the Association's lease and that the manner in which it terminated the lease was appropriate.  Third, Sky Ranch argues that the trial court prematurely dismissed its claim for tortious interference with business relations.  Last, Sky Ranch argues that the issue of whether the escrow monies constituted full payment of the airport lease was never presented to the court, rendering the trial court's determination both unjustified and based on insufficient evidence.

¶8      We review the trial court's interpretation of the CCRs and lease, and its determination that a provision in the CCRs was ambiguous, for correctness.  *See Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 19, 44 P.3d 663; *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 134 (Utah 1997).  *See generally Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807 ("Restrictive covenants that run with the land and encumber subdivision lots form a contract between subdivision property owners as a whole and individual lot owners; therefore, interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts.").  We grant the trial court no deference when its interpretation of an ambiguous contract term is not based on extrinsic evidence.  *See Meadow Valley Contractors, Inc. v. State Dept. of Transp.*, 2011 UT 35, ¶ 63, 266 P.3d 671.  Next, "[w]hether an issue was properly before the trial court presents a question of law, which we review for correctness."  *Lee v. Sanders*, 2002 UT App 281, ¶ 6, 55 P.3d 1127.  And last, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  Utah R. Civ. P. 52(a).

ANALYSIS

I.  Validity of the 2002 CCRs

¶9      Sky Ranch challenges the trial court's determination that the 1990 CCRs were ambiguous, arguing that the trial court improperly "focus[ed] on just one provision of

the 1990 [CCRs], rather than construing the document as a whole."[3]  Here, the provision in question, the 80 Percent Provision, states,

> Notwithstanding anything herein contained to the contrary, until eighty percent (80%) of the lots in the Development (including additional phases as may be added) have been sold to purchasers, [Sky Ranch] shall have, and is hereby vested with, the right to unilaterally amend this Declaration as may be reasonably necessary or desirable . . . .

The trial court determined the 80 Percent Provision to be unclear as to "whether the number of lots[] from which the 80 percent calculation would be made[] includes only then-existing lots or all future lots."  As a result, the trial court concluded that the 1990 CCRs are ambiguous because the language of the 80 Percent Provision is susceptible to two different interpretations.  *See generally United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 523 (Utah 1993) ("An ambiguity in a contract may arise (1) because of vague or ambiguous language in a particular provision or (2) because two or more contract provisions, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone.").  In light of this ambiguity, the trial court concluded that Sky Ranch's ability to unilaterally amend the CCRs terminated in June 2002 when 81.5% of the platted lots were purchased and that, as a result, the 2002 CCRs were "void *ab initio*" because Sky Ranch did not have "the authority to amend unilaterally the [1990 CCRs]" when it issued the 2002 CCRs.

¶10    However, the trial court "did not base its interpretation of the [80 Percent Provision] . . . on extrinsic evidence of the parties' intent.  Rather, the trial court simply held that" the ambiguity would be construed against Sky Ranch.  *See Meadow Valley*, 2011 UT 35, ¶ 63.  This course of action is unconventional because when a "contract is ambiguous, we seek to resolve the ambiguity by looking to extrinsic evidence of the parties' intent" and only "[i]f extrinsic evidence does not resolve the ambiguity and

---

[3]We determine that Sky Ranch has met its marshaling burden.  *See generally West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah Ct. App. 1991) ("A party challenging the court's interpretation of ambiguous terms of a contract . . . must marshal all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous." (citation and emphasis omitted)).

uncertainty, . . . will we resolve the ambiguity against the drafter." *Id.* ¶ 64. Thus, "because the trial court did not base its conclusion . . . on extrinsic evidence of the parties' intent, we give that conclusion no deference and review for correctness." *Id.* ¶ 63; *see also Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985) ("A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent. If a trial court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard."). Accordingly, "[w]e begin . . . with the contract itself," *see Meadow Valley*, 2011 UT 35, ¶ 64, looking first to its plain "language . . . to determine meaning and intent," *see Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185 (citation and internal quotation marks omitted). When reviewing the plain language of a contract, we seek to "[h]armonize conflicting or apparently ambiguous contract language before concluding that provisions are actually ambiguous." *See Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57. Additionally, "[e]ach contract provision is to be considered in relation to all of the others, with a view toward giving effect to all and ignoring none." *Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061-62 (Utah 1981).

¶11   Sky Ranch contends that the 80 Percent Provision's meaning is clear when read in conjunction with other provisions in the 1990 CCRs, particularly the provisions regarding annexation. Sky Ranch interprets the annexation provisions as demonstrating "a clear intent . . . that Sky Ranch . . . retain the power to amend the [CCRs] until it is finished developing" by providing Sky Ranch with the ability to "continue to annex land to the Development 'for common areas or for subdivisions into additional residential or commercial lots.'" Sky Ranch acknowledges that its right to annex land is limited by the 1990 CCRs "to fifteen years, and to 150 total residential lots," and reconciles these limitations with the 80 Percent Provision by concluding that the 1990 CCRs provide that Sky Ranch's power to unilaterally amend would not terminate until "it has finished developing *and* 80% of the lots are sold."[4]

¶12   Sky Ranch's interpretation, however, is not "reasonably supported by the language of the contract," which precludes the trial court's finding of ambiguity. *See*

---

[4]We assume that Sky Ranch considers the development of the Grassy Meadows community to be complete when 150 lots, the maximum number allowed by the 1990 CCRs, are developed.

*Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995); *accord Daines v. Vincent*, 2008 UT 51, ¶ 31, 190 P.3d 1269 (construing *Ward*); *see also id.* ¶ 25 ("A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (internal quotation marks omitted)); *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 8, 268 P.3d 854 ("In determining whether a contract is ambiguous, we 'consider any credible evidence' but will not conclude that the contract is ambiguous unless both interpretations are 'reasonably supported by the language of the contract.'" (quoting *Ward*, 907 P.2d at 268)). Sky Ranch interprets the 80 Percent Provision as indicating that its right to unilaterally amend the CCRs terminates when 150 lots are available and 120 of those are sold (i.e., 80% of 150). However, such an indication could have been unambiguously made by stating an exact number rather than a percentage. Consistent with our rules of contract construction, we will not interpret the CCRs so as to render the contract's use of a percentage in place of an exact number meaningless. *Cf. Novell, Inc. v. Canopy Grp., Inc.*, 2004 UT App 162, ¶ 27, 92 P.3d 768 (rejecting an interpretation of a term in a contract that "would render meaningless" another term in the contract). *See generally Utah Valley Bank*, 636 P.2d at 1061-62. The use of a percentage in this provision indicates that the threshold identified in the provision is not 120, a sum calculable from the day the CCRs were drafted. Rather, the use of a percentage indicates that the threshold is a figure that is related to the number of lots available in proportion to the number of lots sold and may vary throughout Sky Ranch's development of the community, i.e., as new phases are added before the 80% threshold is met in relation to the previous phase's number of lots available and sold. Further, while the 80 Percent Provision envisions the possibility that Sky Ranch may add lots through additional phases of development, it can also be read as nonetheless requiring the percentage of sold lots to remain below 80% to enable Sky Ranch to unilaterally amend the 1990 CCRs. This reading does not render the use of a percentage meaningless and still permits Sky Ranch to annex property and continue developing, while also suggesting a pace by which development and lot sales should occur and a threshold at which Sky Ranch, as the developer, should take more of a background role in the ongoing functioning of the community. Additionally, several portions of the 1990 CCRs conflict with Sky Ranch's interpretation, such as the fifteen-year limitation on Sky Ranch's "right to annex land to the Property" and the fifteen-year limitation on Sky Ranch's voting rights. These provisions, in addition to the 150-lot cap on development, demonstrate the intent to establish a definite point in time when Sky Ranch would be divested of certain rights. Yet Sky Ranch's reading of the 80 Percent Provision suggests

that it could possibly retain the ability to unilaterally amend the 1990 CCRs in perpetuity, i.e., in the event it never finishes developing and/or 80% of the lots are never sold. Thus, Sky Ranch's suggestion as to how the annexation section could harmonize the terms of the 1990 CCRs and prevent the trial court's finding that the CCRs were ambiguous leads us to the conclusion that the trial court's ultimate determination to construe the 80 Percent Provision as having terminated Sky Ranch's ability to unilaterally amend the CCRs was correct.[5] Accordingly, although the trial court may have inappropriately jumped to construing the 1990 CCRs against Sky Ranch as the drafter, *cf. Meadow Valley*, 2011 UT 35, ¶ 63, its end result—determining that the 2002 CCRs were "void *ab initio*"—was correct.[6]

---

[5]        It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action, and this is true even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court.

*Dipoma v. McPhie*, 2001 UT 61, ¶ 18, 29 P.3d 1225 (emphasis and internal quotation marks omitted).

[6]We also agree with the trial court's conclusion that the 2002 CCRs "did not further any of the three limited purposes enumerated in the 1990 [CCRs] justifying unilateral amendment." Those purposes are

(i) to more accurately express the intent of any provisions of the [1990 CCRs] in the light of then existing circumstances or information; (ii) to better insure, in light of then existing circumstances or information, workability of the arrangement which is contemplated by the [1990 CCRs]; or (iii) to facilitate the practical, technical, administrative or functional integration of any additional tract of subdivision

(continued...)

## II. Termination of the Lease

¶13    Sky Ranch argues that because the Association "materially breached the terms of the Airport Lease," it was "entitled to termination of the lease and to recover its damages incurred." Sky Ranch cites numerous breaches by the Association relating to the Association's obligation to maintain the airport and the facilities and components associated with the airport, and the Association's failure to maintain liability insurance on the airport. Sky Ranch argues that these breaches indicate that the trial court's finding that the Association substantially complied with the lease is clearly erroneous.

¶14    "Substantial compliance is one of the contract law doctrines that has been imported into lease cases." *Housing Auth. of Salt Lake City v. Delgado*, 914 P.2d 1163, 1165 (Utah Ct. App. 1996) (applying the doctrine of substantial compliance to a residential lease); *see also Cache Cnty. v. Beus*, 1999 UT App 134, ¶¶ 31, 41, 978 P.2d 1043 (acknowledging the potential application of the substantial compliance doctrine to a "negotiated commercial lease between sophisticated parties"). In evaluating lease termination issues, "[w]e observe a general policy disfavoring forfeitures. The substantial compliance doctrine furthers that policy by allowing equity to intervene and rescue a lessee from forfeiture of a lease when the lessee has substantially complied with the lease in good faith." *Delgado*, 914 P.2d at 1165 (citation omitted). "Whether a breach is so insubstantial as to trigger the application of [the substantial compliance doctrine] is a question of fact." *Id.* A trial court can look to the following factors for assistance in determining the materiality of a breach:

> "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any

---

[6](...continued)
into the Development.

reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Beus*, 1999 UT App 134, ¶ 37 (quoting Restatement (Second) of Contracts § 241 (1981)).

¶15    Here, the trial court considered the above factors in turn, determining that neither Longley nor the Grassy Meadows Airport would be "deprived of any benefit to which they are entitled under the Lease, including receiving regular lease payments," while "the Association would suffer greatly if the lease were terminated" because "[t]he very purpose for the Community was to have access to a private airport." Next, the trial court found that "[t]he evidence presented established that any alleged breaches have been cured." The trial court noted Longley's own "admission that the Association reacted to his Notice of Termination with 'frenzied efforts' to cure the alleged deficiencies," which "also evinces good faith on the part of the Association to comply with all its obligations under the Lease." The trial court listed several repairs and improvements the Association performed on the airport property and noted that "[a]lthough maintenance issues arose from time to time, . . . [they fell] within what would reasonably be expected as normal wear and tear," and that otherwise, "the Airport was always in reasonably good working order and condition."[7] The trial court also cited "the Association['s] . . . continued . . . use [of] the Airport . . . since the alleged breach occurred without further complaint from Mr. Longley and without any accident or adverse incident" as evidence of "[t]he Association's good faith efforts to meet all its obligations under the Lease." Though the record contains some evidence that does not support the trial court's determination, the record also contains sufficient evidence that supports the ruling as not clearly erroneous. Therefore, we affirm the trial court's

---

[7]We note that although the lease is intended to be a "'triple-net lease'" in terms of exempting Sky Ranch from any taxes, insurance, or maintenance obligations under the lease, it also provides that "normal wear and tear [is] excepted" from the Association's maintenance obligations. We view this seeming contradiction as requiring the Association to remedy normal wear and tear but excepting the normal wear and tear that occurred under the facts and circumstances of this case from constituting a material breach.

ruling that the lease should not have been terminated because the Association substantially complied with the lease's terms.[8]

### III. Tortious Interference

¶16 Sky Ranch next contends that it was not given the opportunity to present evidence on its tortious interference counterclaim. The tortious interference claim is based on the argument that the Association agreed to the development of the FBO, thereby prohibiting it from opposing Sky Ranch's request for the zoning change necessary to permit that development. In other words, Sky Ranch alleges that the Association effectively contracted away its right to petition the government in a manner that would "interfere with the development of the FBO."[9] Sky Ranch's trial brief references the airport lease, the 1990 CCRs, a set of Association meeting minutes, and an agreement titled the "FBO Agreement" as allegedly demonstrating the Association's awareness of, and assent to, the development of the FBO. Sky Ranch's third amended counterclaim also references the Association's Articles of Incorporation for support, quoting the articles as stating, "No substantial part of the activities of the corporation shall consist of carrying on propaganda or otherwise trying to influence legislation." (Internal quotation marks omitted.)

¶17 Based on the record before us, we determine that it is impossible to know one way or another whether Sky Ranch's tortious interference claim was properly dismissed

---

[8]Additionally, the trial court determined that Longley and Grassy Meadows Airport did not comply with the notice requirements of the lease when they sought to terminate the lease, which rendered the termination ineffective, and that they were "equitably estopped from seeking termination as a remedy for any minor breach that may have occurred" because Association members "relied on" Longley's representation that they would have exclusive access to a private airstrip when they purchased their lots. Because of the manner in which we resolved the lease termination issue, we do not address these additional arguments.

[9]Sky Ranch's trial brief also alludes to "other efforts by [Sky Ranch] to develop [Grassy Meadows that] have been thwarted by the Association" but does not provide any details about those "other efforts."

by the trial court in the manner that occurred here.[10] At trial, the parties and trial court seemingly agreed that more time was needed because they "didn't get to the part of the case on the tortious interference" and because "[t]here ha[d]n't been evidence on this point." At the close of the second day of trial, Sky Ranch declined the Association's suggestion that Sky Ranch "make a proffer as to . . . [the] evidence they want to put on for tortious interference," preferring to present its arguments and evidence during an additional day of trial, as initially planned. We can only speculate what that evidence would have been and what weight it would have carried in proving Sky Ranch's claim; Sky Ranch's pretrial disclosures included a list of forty-five potential witnesses and 172 potential documents or exhibits. During the two days of trial that did occur, Sky Ranch called only four witnesses and the trial court admitted only forty-four documents and exhibits into evidence between the parties. Of the five documents referenced in the trial brief and counterclaim, only three were admitted at trial (the 1990 CCRs, the airport lease, and the meeting minutes); one was never addressed (the Association's Articles of

---

[10]We recognize that the Noerr-Pennington Doctrine relied on by the trial court may ultimately apply, defeating Sky Ranch's tortious interference claim. *See Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶¶ 25-28, 116 P.3d 323 (explaining that the Noerr-Pennington Doctrine "protect[s] political activity against tort claims as well as antitrust claims," and rejecting the plaintiff's tortious interference claim based on the defendant's "efforts to derail [the plaintiff's] zoning change application, which was before the City Council"). However, in order to reach that conclusion, the trial court needed to determine whether the Association waived its constitutional right to petition the zoning board in a valid contract or otherwise. *See generally Mood For A Day, Inc. v. Salt Lake Cnty.*, 953 F. Supp. 1252, 1268 (D. Utah 1995) ("To find waiver, a fact finder must determine that plaintiff voluntarily and knowingly waived its constitutional rights."); *Barnard v. Wassermann*, 855 P.2d 243, 247 (Utah 1993) ("[A]lthough courts indulge a presumption against waiver of constitutional rights, the presumption is rebuttable. Waiver is deemed to occur when the totality of the circumstances indicates an intentional abandonment or relinquishment of a known constitutional right." (citation omitted)). Because the admissibility of the FBO Agreement was never ruled on, and because Sky Ranch had possibly several other documents and witnesses to present in support of this point, we cannot determine whether Sky Ranch would have succeeded in proving that the Association waived its constitutional rights or whether the trial court's application of the Noerr-Pennington Doctrine was ultimately correct.

Incorporation); and the other was withdrawn at the request of Sky Ranch (the FBO Agreement).

¶18    In sum, there were dozens of potential witnesses, exhibits, and documents that were not presented to the court that may have supported Sky Ranch's tortious interference claim. Sky Ranch simply did not have an opportunity to present its evidence on this counterclaim. Accordingly, we remand to the trial court for the narrow purpose of hearing the evidence Sky Ranch intended to present in support of its tortious interference claim. The trial court's determinations as to the 1990 CCRs and breach of the airport lease remain unchanged, as indicated above.

IV. Escrow

¶19    Last, Sky Ranch argues that "[t]he trial court erred in making any ruling as to the sufficiency of the amount of money held in escrow, as it was not properly before the court." "A trial court's findings should fit within the framework of the petition as originally drawn, or as amended and should be supported by the evidence presented," although "a trial court may infer an amendment to the pleadings if the issue is tried by the [p]arties' express or implied consent." *Lee v. Sanders*, 2002 UT App 281, ¶ 7, 55 P.3d 1127 (internal quotation marks omitted). A court can determine that implied consent was given "where one party raises an issue material to the other party's case or where evidence is introduced without objection, [and] where it appear[s] that the parties understood the evidence [was] to be aimed at the unpleaded issue." *Id.* (alterations in original) (internal quotation marks omitted). However, "[a] trial court may not base its decision on an issue that was tried inadvertently." *Archuleta v. Hughes,* 969 P.2d 409, 413 (Utah 1998) (internal quotation marks omitted).

¶20    Here, the airport lease issue unavoidably involves the sub-issue of what to do with the monies held in escrow. Therefore, we disagree with Sky Ranch that the issue was not properly before the trial court. Where the trial court did err, however, was in concluding that the amount in escrow constituted the amount of rent actually due, when the amount due under the lease was to be determined "on an annual basis based on the Published National Consumer Price Index for Southwestern Utah" and no evidence was presented as to such. Accordingly, we reverse the trial court's determination that the amount held in escrow constituted the amount due and remand for further proceedings during which the trial court can hear the evidence necessary to

determine the amount due under the lease from the date of the Association's last accepted lease payment through the time at which the trial court resolves this matter.[11]

CONCLUSION

¶21    We affirm the trial court's determination that the 2002 CCRs were invalid because Sky Ranch's ability to unilaterally amend the 1990 CCRs terminated when 80% of the lots then available in the community sold.  We also affirm the trial court's determination that the Association did not materially breach the terms of the airport lease.  We reverse the trial court's dismissal of Sky Ranch's tortious interference claim and its determination that the monies held in escrow constituted the full amount of rent due under the lease, and remand for further proceedings on those two matters in accordance with this opinion.

_____
James Z. Davis, Judge

-----

¶22    WE CONCUR:

_____
William A. Thorne Jr., Judge

_____
Stephen L. Roth, Judge

_____

[11]The trial court's judgment states, "If an appeal is taken, the monies will continue to be held in escrow and [the Association] will continue to make lease payments to the Court pending final resolution of this issue."