**2022 UT 17**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

WDIS, LLC as Trustee of the MDMG TRUST, Dated April 25, 2016, and
DREAMWORKS PROPERTY MANAGEMENT, INC. as Trustee of the STEP
MOUNTAIN ROAD LAND TRUST, Dated November 6, 2007,
*Appellants,*

*v.*

HI-COUNTRY ESTATES HOMEOWNERS ASSOCIATION, PHASE II,
*Appellee.*

No. 20200849
Heard February 9, 2022
Filed April 28, 2022

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable Laura S. Scott
No. 160904994,
(consolidated with Nos. 170903466, 170904171, 190909656)

Attorneys:

Troy L. Booher, Beth E. Kennedy, Taylor P. Webb, Bruce R. Baird,
Salt Lake City, Landon A. Allred, South Jordan, for appellants

Stephen T. Hester, Bradley M. Strassberg, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE PEARCE, JUSTICE PETERSEN, JUDGE MORTENSEN, and
JUDGE TENNEY joined.

Having recused themselves, ASSOCIATE CHIEF JUSTICE LEE and
JUSTICE HIMONAS do not participate herein;
COURT OF APPEALS JUDGE DAVID N. MORTENSEN and
COURT OF APPEALS JUDGE RYAN D. TENNEY sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 In 1973, Charles Lewton signed and recorded documents purporting to create a homeowners association covering 2,000 acres of land near rural Herriman, Utah. He sought to make that land subject to various restrictive covenants. Years later, a group of landowners (the Landowners) purchased properties within the HOA's boundaries. But in 2015, during a protracted dispute over the Landowners' attempts to develop their property, they discovered that Mr. Lewton had owned just a single eight-acre parcel of the 2,000 acres he purported to include within the HOA, and no other landowners had signed the recorded documents.

¶2 Based upon this information, the Landowners sued to quiet title to their property. They filed a motion for summary judgment, arguing that the HOA and its subsequently amended restrictive covenants were void ab initio (from the beginning) based on a public policy invalidating covenants not signed by the affected landowner. The district court denied the motion, and the Landowners appealed. On appeal, the Landowners argue the covenants must be declared absolutely void under the test established in *Ockey v. Lehmer*[1] because they violate public policy as articulated in the Wrongful Lien Act (WLA), the statute of frauds, and Utah caselaw. But because these authorities do not evince the public policy the Landowners suggest, we affirm the district court's decision.

## Background

¶3 The Hi-Country Estates Homeowners Association, Phase II (the HOA), encompasses approximately 2,000 acres of land near Herriman, Utah. The HOA was established in 1973, and, sometime thereafter, the Landowners began purchasing property within its boundaries.[2]

---

[1] 2008 UT 37, 189 P.3d 51.

[2] The Landowners are: (i) WDIS, LLC, as Trustee for the MDMG Trust, dated April 25, 2016; (ii) Dreamworks Property Management, Inc., as Trustee of the Step Mountain Road Land Trust, dated November 6, 2007; (iii) Tanaka, LLC; (iv) Brandon Frank; (v) SMR, LLC as trustee of the 64K Trust, dated January 15, 2015; the CA Trust, dated January 5, 2015; the SB Trust, dated December 29, 2014; the E-36 Trust, dated July 15, 2015; the LR Trust, dated January 22,

(continued . . .)

¶4 Eventually, the Landowners attempted to develop their properties. But they claim they have been prevented from doing so because the HOA refuses to provide the necessary infrastructure. This has led to years of litigation between the Landowners and the HOA, beginning with a derivative suit brought by the Landowners in 2009, alleging that the HOA did not treat all lot owners equally. We reversed the district court's dismissal of that case in *Hi-Country Property Rights Group v. Emmer*.[3]

¶5 Later, in 2015, the Landowners obtained documents that they argue prove "serious problems with the validity of the HOA's governing documents." They discovered that the HOA's governing documents, including various restrictive covenants, were signed and recorded by Charles Lewton, who owned a mere eight of the two thousand acres (0.4%) he sought to include within the boundaries of the HOA. The covenants lacked the signature of any other landowner, and there are apparently no other documents in which the other landowners authorized the HOA covenants to be recorded on their properties.

¶6 The covenants were amended in 1980, changing the boundaries of the HOA. These amendments were signed by three members of the HOA's board, professedly "in response to the wishes of the majority of the Association Members during the Annual Membership Meeting." But, as with the original covenants, there is apparently no written document signed by the owners of the affected properties authorizing the 1980 amendments.

¶7 After learning this information, the Landowners sued the HOA to quiet title to their properties. (One Landowner, WDIS, also purchased nine more parcels.) Once again, we reversed the district court's dismissal of the case, remanding for the district court "to determine whether the HOA's encumbrances are void or voidable."[4]

¶8 Upon remand, the district court consolidated the case with several others in which the HOA sought to enforce certain assessments it had levied against the Landowners. The Landowners

---

2015; and the LAM 5 Trust, dated February 2, 2015; (vi) J&S Property Ventures, LLC; and (vii) Step Mountain, LLC.

[3] 2013 UT 33, ¶ 12, 304 P.3d 851.

[4] *See WDIS, LLC v. Hi-Country Ests. Homeowners Ass'n*, 2019 UT 45, ¶¶ 59–60, 449 P.3d 171.

filed an amended complaint to quiet title and then filed the motion for summary judgment that we review in this case.

¶9 As exhibits to their summary judgment motion, the Landowners attached evidence that the individuals who signed the covenants in 1973 and 1980 did not own most of the land they sought to restrict, including the properties now owned by the Landowners. They argued that the restrictive covenants were void ab initio and therefore incapable of ratification. They based their argument on public policy reflected in such authority as the WLA, the statute of frauds, and Utah caselaw.

¶10 The district court denied the Landowners' motion, applying the two-factor test we set forth in *Ockey v. Lehmer*, which directs courts to examine (1) whether the law has already declared the type of contract at issue to be "absolutely void as against public policy" and (2) whether such contract harms the general public.[5] As to the first factor, the district court disagreed with the Landowners that the WLA and the statute of frauds evinced a clear public policy against the covenants. And as to the second factor, the court found that the covenants potentially harmed only the landowners within the HOA's purported jurisdiction and not the public as a whole.[6]

¶11 The Landowners' summary judgment motion having been denied, the case is set to proceed to trial. We agreed to consider the Landowners' interlocutory appeal. We have jurisdiction pursuant to Utah Code § 78A-3-102(3)(j).

---

[5] 2008 UT 37, ¶ 24, 189 P.3d 51; *see also Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶¶ 24–25, 469 P.3d 1035 (rearticulating and applying the two *Ockey* factors).

[6] The HOA opposed the motion, in part, on the ground that the Landowners had ratified the covenants. The district court declined to decide the motion on such grounds. As the court pointed out, "the HOA did not file a cross motion for summary judgment on ratification" and there were "disputed material facts" regarding the issue. Similarly, we do not consider the arguments the HOA makes on appeal that relate to whether the Landowners ratified the covenants.

## Standard of Review

¶12 "On interlocutory appeal, we review grants and denials of summary judgment for correctness."[7] Summary judgment is appropriate "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[8] "We view the facts and indulge reasonable inferences in the light most favorable to [the HOA], the nonmoving party."[9]

## Analysis

¶13 The Landowners argue that because the restrictive covenants in this case were not signed by the affected property owners, they are void ab initio. We disagree and affirm the district court's decision.

### I. The Restrictive Covenants Are Voidable, Not Void Ab Initio

¶14 In *Ockey v. Lehmer*, we were asked to determine whether a conveyance of an interest in property was void ab initio or merely voidable where the transferors lacked authority to convey the property.[10] We explained that the "distinction between void and voidable is important" because a "contract or a deed that is void cannot be ratified or accepted, and anyone can attack its validity in court. In contrast, a contract or deed that is voidable may be ratified at the election of the injured party. Once ratified, the voidable contract or deed is deemed valid."[11]

¶15 In making this determination, we "start with the presumption that contracts are voidable unless they clearly violate public policy."[12] And due to this presumption, the Landowners' showing that the covenants[13] violate public policy must be "free from doubt."[14]

---

[7] *Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34, ¶ 11, 493 P.3d 644.

[8] *Id.* (citation omitted).

[9] *Id.*

[10] 2008 UT 37, ¶¶ 15, 17, 189 P.3d 51.

[11] *Id.* ¶ 18 (citations omitted).

[12] *Id.* ¶ 21.

[13] "A real estate covenant is a contract . . . ." *Wise v. Harrington Grove Cmty. Ass'n*, 584 S.E.2d 731, 739 (N.C. 2003).

[14] *Ockey*, 2008 UT 37, ¶ 21 (citation omitted).

¶16 The Landowners argue, although they do not brief the issue extensively, that the presumption does not apply here because it arises from parties' freedom to contract and that in this case, "the protective covenants at issue were not contractual" because "they did not involve two parties agreeing to perform acts in relation to each other." We conclude that applying the presumption is appropriate.

¶17 We acknowledge that the covenants at issue here differ from a traditional contract in that, initially, they were unilaterally imposed. But even under these circumstances, the freedom to contract is implicated because the question we are resolving is whether parties "of full age and competent understanding"[15] are free either to accept or reject those covenants later on. And there are other reasons, beyond the freedom of contract, to apply the presumption.

¶18 For one, voiding the covenants ab initio is a severe remedy. As long as the party affected by a defective covenant is free either to ratify or reject such a covenant, it is usually unnecessary for the court to make that decision for her by voiding it altogether. And because simply declaring the covenant voidable will normally be an adequate remedy, the covenant should clearly violate public policy before we declare it absolutely void. That is why we have applied the presumption even where the contract at issue was entered for a fraudulent purpose.[16]

¶19 Another reason for applying the presumption is that voiding even defective covenants will upset certain reliance interests. And in some cases, like this one, where the covenants have existed for decades, those interests may be especially substantial.

¶20 Having explained why the presumption of voidability applies, we turn to whether the Landowners have overcome it. In *Ockey*, we held that the unauthorized conveyance of a property interest was merely voidable.[17] In making that determination, we noted first that no statute had declared the type of transaction absolutely void as against public policy, and second, the

---

[15] *See id.* (citation omitted).

[16] *See Wittingham, LLC v. TNE Ltd. P'ship*, 2020 UT 49, ¶¶ 8, 25, 469 P.3d 1035.

[17] 2008 UT 37, ¶¶ 24–25.

unauthorized transfer affected only the rightful owner—not the general public.[18]

¶21 Later, in *Wittingham, LLC v. TNE Limited Partnership*, we characterized our observations in *Ockey* as a two-factor test for "determining whether a contract clearly violates public policy."[19] The test asks "(1) whether the law or legal precedent has declared that the type of contract at issue is 'unlawful' and 'absolutely void,' and (2) whether 'the contract harmed the public as a whole—not just an individual.'"[20]

¶22 We discuss each factor in turn and hold that the restrictive covenants at issue are voidable, not absolutely void, and affirm the district court.

*A. The Statutes and Caselaw Cited by the Landowners Do Not Evince a Clear Public Policy Declaring the Restrictive Covenants Absolutely Void*

¶23 The Landowners argue that three sources of public policy make the restrictive covenants at issue absolutely void. These are (A) the WLA, (B) the statute of frauds, and (C) Utah caselaw. Below, we explain why we disagree with the Landowners' conclusions about each source of law.

1. The Wrongful Lien Act Is Not a Source of Public Policy Compelling Us to Declare the Covenants Void Ab Initio

¶24 The first statute the Landowners cite as a source of public policy is the WLA. They argue that the WLA "confirms that an encumbrance is void if it is not signed by the owner." The Act defines a wrongful lien to include "any document that purports to create . . . [an] encumbrance on an owner's interest in certain real property" if it is not expressly authorized by statute, authorized by a court, or "signed by . . . the owner of the real property."[21] And it directs courts to declare wrongful liens "void ab initio."[22] So, the Landowners argue, because the restrictive covenants are

---

[18] *Id.* ¶ 24.

[19] 2020 UT 49, ¶ 24 (footnotes omitted) (quoting *Ockey*, 2008 UT 37, ¶ 23).

[20] *Id.*

[21] UTAH CODE § 38-9-102(12).

[22] *Id.* § 38-9-205(5)(a).

"encumbrances" that were not authorized by a document signed by the owners of the encumbered land, they are void ab initio.

¶25 We disagree. Although a restrictive covenant could be considered an encumbrance, we are not convinced it is the sort of encumbrance contemplated by the WLA. An "encumbrance" may be defined broadly as "any property right that is not an ownership interest."[23] Thus defined, an encumbrance may well include a restrictive covenant because neighboring property owners have the "property right" to enforce such a covenant. But the term may also be defined more narrowly as a "claim or liability that is attached to property . . . that may lessen its value, such as a lien or mortgage."[24] The latter definition is less likely to include a restrictive covenant. And it is also the definition we find more applicable to the WLA.

¶26 The WLA, as its name suggests, is focused on liens, not on all nonpossessory property interests. A "lien" is generally understood to be a "legal right or interest that a *creditor* has in another's property, lasting [usually] until a debt or duty that it secures is satisfied."[25] This comports more closely with the narrow "claim or liability" definition of "encumbrance" than it does with the broader "property right" definition.

¶27 Given the Act's focus on liens and the different definitions of "encumbrance," it is at least ambiguous whether the WLA would apply to restrictive covenants. And where such ambiguity exists, "we read the statute in harmony with other statutes under the same and related chapters."[26] The WLA is codified under Title 38 of the Utah Code, the subject of which is "Liens." There are many types of liens addressed in the thirteen chapters of Title 38—everything from construction liens to airline liens—but neither covenants, generally, nor restrictive covenants, specifically, are ever mentioned.

---

[23] *Encumbrance*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[24] *Id.*; *see also Encumbrance*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/encumbrance (last visited Apr. 14, 2022) (defining "encumbrance" as "a claim (such as a mortgage) against property").

[25] *Lien*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).

[26] *Wittingham*, 2020 UT 49, ¶ 26 (citation omitted) (internal quotation marks omitted).

¶28 In short, we cannot say that an Act directed at wrongful liens "provides a well-defined and dominant public policy supporting the conclusion" that restrictive covenants not signed by the proper landowners are void.[27] Even if the Landowners are correct that the restrictive covenants at issue are encumbrances that technically fit within the WLA's definition of "wrongful lien," such a conclusion is not "free from doubt," for the reasons we have identified.[28]

¶29 Additionally, we agree with the district court's conclusion that "the mere fact the 1980 Covenants may be ultimately determined to be invalid does not necessarily make them wrongful or void *ab initio* under the Act." Under the Act's definition of "wrongful lien," a lien is not wrongful if it is "expressly authorized" by statute.[29] In *Hutter v. Dig-It, Inc.*, we interpreted the meaning of the phrase "expressly authorized" as used in the WLA.[30] There, the appellees argued that a mechanic's lien imposed in violation of the requirements of the Mechanic's Lien Act was a "wrongful lien" under the WLA. They reasoned that "an unenforceable lien cannot be expressly authorized by statute."[31] We disagreed, holding that the phrase "not expressly authorized by . . . statute" "does not include statutorily created liens," even where such liens are invalid and unenforceable under the statute that governs the lien.[32] So we determined that because the type of lien at issue was authorized by the Mechanic's Lien Act, it could not be a "wrongful lien" under the WLA, even though it was ultimately unenforceable. The Landowners' arguments in this case ignore *Hutter*'s holding. Even though, as the Landowners point out, no statute "allows protective covenants to become valid if they are signed without the

---

[27] *Id.* ¶ 27.

[28] *See id.* ¶ 25.

[29] UTAH CODE § 38-9-102(12).

[30] 2009 UT 69, ¶¶ 46, 49, 219 P.3d 918.

[31] *Id.* ¶ 46. This is similar to the Landowners' argument in this case that, although the Community Association Act authorizes the recording of restrictions in HOA boundaries, it does not authorize restrictions that are not signed by the proper landowners—so such restrictions cannot be authorized under the WLA.

[32] *Id.* ¶ 52.

landowner's knowledge or consent," the fact that a statute allows them at all removes them from the WLA's purview.[33]

¶30 For the reasons we have articulated, the WLA does not provide "a well-defined and dominant public policy supporting the conclusion that the type of contract at issue in this case is void."[34]

2. The Statute of Frauds Is Not a Source of Public Policy Compelling Us to Declare the Covenants Void Ab Initio

¶31 The Landowners next argue that the statute of frauds, particularly Utah Code sections 25-5-1 and 25-5-3, expresses a clear public policy that "conveyances and encumbrances that are not signed by the owner are unlawful and absolutely void." We disagree. The statute of frauds does not lead to a conclusion "free from doubt" that all conveyances and encumbrances not signed by the property owner are completely void and incapable of ratification. This is so for two reasons. First, the primary purpose of the statute of frauds is evidentiary—to require that certain important agreements be evidenced by a writing and signed by the person being charged with the agreement. Its purpose is not to make all unsigned contracts regarding property rights absolutely void. And second, the statute of frauds contains several exceptions, which fact cuts against the Landowner's assertion that the statute of frauds declares the restrictive covenants at issue completely void and incapable of ratification.[35]

---

[33] We agree with the Landowners that the ultimate question we must answer is not whether *all* restrictive covenants are absolutely void, but whether they "are absolutely void if they were entered into without the property owner's knowledge or consent." But because the Landowners invoke the WLA, we must analyze that question in light of the WLA as it has been interpreted. And the WLA simply does not apply to categories of liens or encumbrances that have been authorized by statute generally, even where the specific encumbrance at issue is defective under the authorizing statute.

[34] *Wittingham*, 2020 UT 49, ¶ 27.

[35] When discussing the statute of frauds issue, the district court assumed that the restrictive covenants do not comply with the statute. For purposes of this opinion we also assume, without deciding, that the restrictive covenants do not comply with the statute of frauds.

¶32 The Landowners point to Utah Code sections 25-5-1 and 25-5-3, claiming that these sections render the restrictive covenants void. Utah Code section 25-5-1 states, in relevant part, that "[n]o estate or interest in real property . . . shall be created, granted, assigned, surrendered or declared otherwise than . . . by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same." Similarly, Utah Code section 25-5-3 states that "[e]very contract . . . for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the . . . sale is to be made." These two provisions establish a general rule that for agreements regarding interests in real property, the agreement must be evidenced by a writing that is signed by the person against whom the agreement is being enforced.

¶33 The purpose of the statute of frauds is not, as the Landowners argue, to completely void all agreements not signed by the owner of real property. The statute's "primary purpose . . . is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made."[36] The high evidentiary standard of the statute of frauds demonstrates the legislature's judgment that "it is preferable to invalidate a few otherwise legitimate agreements because they were not written than to burden the system and the citizenry with claims premised on bogus, unwritten agreements."[37]

---

[36] RESTATEMENT (SECOND) OF CONTRACTS § 131, cmt. c (AM. L. INST. 1981); *see also Martin v. Scholl*, 678 P.2d 274, 275 (Utah 1983) (stating that the purpose of the statute of frauds is to impose "a high evidentiary standard by which oral real estate contracts must be proved to qualify for a specific performance" (citation omitted)); *Guinand v. Walton*, 450 P.2d 467, 469 (Utah 1969) ("The purpose of the statute [of frauds] is that certain matters of great importance such as the conveyance of real estate should be protected against frauds and perjuries.").

[37] *Coleman v. Stuart*, 2019 UT App 165, ¶ 36, 451 P.3d 658 (citation omitted). The Landowners cite this language as "conclusively establish[ing] that the protective covenants here are void ab initio under *Ockey*." But that is not what *Coleman* says. The cited language merely recognizes that, in instances where the statute of frauds is applied, some otherwise legitimate unwritten agreements will not be enforced due to lack of evidence.

Given this largely evidentiary purpose of the statute of frauds, we cannot say that the statute proclaims a clear public policy that all encumbrances and conveyances not signed by the property owner are absolutely void.

¶34 In addition to the statute of frauds' evidentiary purpose, the fact that the statute contains several exceptions also weighs against a finding that the statute evinces a public policy that all non-complying contracts are void ab initio. One of these exceptions, which allows a court to grant specific performance of non-complying contracts in the case of part performance, is embedded in the statute of frauds itself at Utah Code section 25-5-8.[38] The fact that a court may enforce a non-complying contract when the parties have partially performed their obligations undermines the conclusion that all conveyances and encumbrances not signed by the property owner are void.

¶35 It is also possible for an agreement that violates the statute of frauds to become enforceable through estoppel.[39] We find the estoppel exception particularly important because, for purposes of the void/voidable issue, the doctrines of ratification and estoppel are closely related.[40] Indeed, we fail to see a meaningful distinction between a party's being able to ratify an otherwise unenforceable agreement and a party being estopped from contesting the enforceability of an agreement in litigation. In both cases, the party's

---

[38] Three elements must be met for the part performance exception to apply: (1) "the oral contract and its terms must be clear and definite;" (2) "the acts done in performance of the contract must be equally clear and definite;" and (3) "the acts must be in reliance on the contract." *Randall v. Tracy Collins Tr. Co.*, 305 P.2d 480, 484 (Utah 1956).

[39] *Fericks v. Lucy Ann Soffe Tr.*, 2004 UT 85, ¶ 14, 100 P.3d 1200 ("[T]o establish the promissory estoppel exception to the statute of frauds, [t]he acts and conduct of the promissor must so clearly manifest an intention that he will not assert the statute that to permit him to do so would be to work a fraud upon the other party." (second alteration in original) (citation omitted) (internal quotation marks omitted)).

[40] *See Ockey*, 2008 UT 37, ¶ 22, (noting that the difference between a void contract and a voidable contract is whether the contract "could become enforceable by ratification or estoppel").

conduct renders the otherwise unenforceable agreement enforceable—something that could not occur if the agreement was void ab initio.[41]

¶36 The fact that a party can waive a statute of frauds defense also cuts against the public policy identified by the Landowners. There are several ways a party can waive a statute of frauds defense, including by (1) failing to plead the statute as an affirmative defense; (2) admitting the existence of the agreement in the pleadings; and (3) admitting at trial the existence and all essential terms of the contract.[42] The fact that a party can be bound by a non-complying agreement by admitting its existence during litigation is incompatible with a conclusion that a non-complying agreement is void ab initio and incapable of ratification. If a non-complying contract is void ab initio, then it is unenforceable in all circumstances.

¶37 The Landowners, recognizing the implications of the exceptions to the statute of frauds, argue that while "some documents that violate the statute of frauds may be voidable" under the exceptions, the covenants here are void because none of the exceptions apply in this particular case. But whether an exception applies in this case is irrelevant in determining whether the statute of frauds evinces a clear public policy that the restrictive covenants are void ab initio. When searching a statute for legislative declarations of public policy, we look only at the "type of contract at issue" and see if the legislature has declared that type of contract to be unlawful and absolutely void.[43] We do not apply the statute directly to the

---

[41] Our conclusion regarding estoppel is also consistent with *Wittingham*. In that case, the issue was whether a contract entered into by the partner of a dissolved partnership was void or voidable. 2020 UT 49, ¶¶ 5–7, 22. Though the statute at issue did not give the partner actual authority to bind the partnership to the contract, *id.* ¶¶ 29–30, we found that the contract was merely voidable, in part, because the statute incorporated a partnership by estoppel exception. *Id.* ¶ 34.

[42] *See Bentley v. Potter*, 694 P.2d 617, 621 (Utah 1984) ("The statute of frauds is a defense that can be waived by a failure to plead it as an affirmative defense, admitting its existence in the pleadings, or admitting at trial the existence and all essential terms of the contract." (citations omitted)).

[43] *Wittingham*, 2020 UT 49, ¶ 26.

specific contract at issue in the case. So we reject the Landowners' request to have us consider whether any of the exceptions to the statute of frauds apply to the restrictive covenants.[44]

¶38 Because the statute of frauds serves mainly evidentiary purposes, and because the statute contains several exceptions that allow non-complying contracts to become enforceable, we conclude that the statute does not evince a clear public policy that the restrictive covenants here are absolutely void and incapable of ratification.

3. Utah Caselaw Includes No Public Policy Compelling Us to Declare the Covenants Void Ab Initio

¶39 Finally, the Landowners argue that caselaw from this court and the court of appeals confirms that restrictive covenants not signed by the proper landowner are absolutely void. Although judicial opinions, like statutes, may be an independent source of public policy for holding contracts void ab initio,[45] we do not find such a policy clearly established in our caselaw.

¶40 Of the cases cited by the Landowners, perhaps the one that comes closest to articulating the public policy they would have us find is *Gunnell v. Hurst Lumber Co.*[46] There, a set of restrictive covenants ostensibly applying to several contiguous parcels of property was not signed by the owner of one of the parcels.[47] When the plaintiffs in *Gunnell* sued for a declaratory judgment that the subsequent landowner was subject to the restrictions, we affirmed the district court's contrary determination, citing the statute of

---

[44] In *Wittingham*, for instance, we did not decide whether any of the exceptions listed in the relevant statute actually applied to the contract at issue. Instead, we decided that the exceptions to the statute suggested "the existence of a general public policy" that was inconsistent with a finding that the statute "served as a legislative declaration that the type of contract at issue" in the case was unlawful and absolutely void. *Id.* ¶ 34.

[45] *Id.* ¶ 24 (explaining that the first *Ockey* factor is "whether the law *or legal precedent* has declared that the type of contract at issue is 'unlawful' and 'absolutely void'" (emphasis added) (citing *Ockey*, 2008 UT 37, ¶ 23)).

[46] 515 P.2d 1274 (Utah 1973).

[47] *Id.* at 1274.

frauds and stating that if the plaintiffs had wanted the land to be under the restrictive covenants, "they should have had [the owner] sign the document."[48]

¶41 As the Landowners point out, the facts of *Gunnell* are similar to those in this case, including the fact that the subsequent landowner in *Gunnell* was aware of the covenants when it purchased the property.[49] But although we held that the specific covenants at issue in *Gunnell* were unenforceable, we stopped short of "declar[ing] that the *type* of contract at issue [was] 'unlawful' and 'absolutely void.'"[50] Because a statement of public policy must be clear and "free from doubt,"[51] a case in which we invalidated particular restrictive covenants without a broader statement that such covenants are categorically void and incapable of ratification is insufficient.[52]

¶42 This insufficiency is also present in *Thompson v. Capener*,[53] also cited by the Landowners. There, the court of appeals applied the statute of frauds to invalidate covenants that were signed by only one of two owners.[54] But the court also examined whether the non-signing owner had ratified the covenants.[55] And although the owner had not ratified the covenants under the facts of that case, the court, by undertaking the ratification analysis acknowledged that ratification was possible.[56] Accordingly, the Landowners cannot rely upon *Thompson* as a source of public policy invalidating all unsigned restrictive covenants.

---

[48] *Id.* at 1274–75.

[49] *Id.* at 1274.

[50] *See Wittingham*, 2020 UT 49, ¶ 24 (emphasis added).

[51] *Id.* ¶ 25.

[52] In *Gunnell*, we did state that knowledge of the covenants on the part of the subsequent landowner was "immaterial." 515 P.2d at 1275. Although this suggests that the subsequent landowner's knowledge was insufficient to ratify the covenants, it does not suggest that unsigned covenants are never capable of ratification.

[53] 2019 UT App 119, 446 P.3d 603.

[54] *Id.* ¶¶ 2, 20.

[55] *Id.* ¶¶ 8, 16.

[56] *Id.* ¶ 16.

¶43 Similarly, the other cases the Landowners cite do not include the clear public policy they would have us find. In *Metropolitan Water District of Salt Lake & Sandy v. SHCH Alaska Trust*, we held only that the Limited Purpose Local Districts Act did not grant a local district authority to enact land use regulations.[57] And in *Salt Lake County v. Metro West Ready Mix, Inc.*, we held only that a purchaser of property is not protected by Utah's recording statute if "he is on notice that his grantor has no record title to the property conveyed."[58] These cases simply do not declare that unsigned restrictive covenants are absolutely void.[59]

¶44 The Landowners also cite *Grassy Meadows Sky Ranch Landowners Ass'n v. Grassy Meadows Airport, Inc.*[60] for the proposition that "*amendments* to protective covenants are void if they were enacted without authority." There, the court of appeals did uphold the district court's determination that a set of amended restrictive covenants were "void *ab initio*" where a development company sought to enact them after the period for amendments provided by the original covenants had passed.[61] But like the other cases, *Grassy Meadows* includes no clear statement of public policy, and its holding is therefore limited to its facts. Also, though it is clear why the amended covenants were unenforceable in that case, we are not so sure the determination that they were void ab initio is correct. In other words, we do not see why the amended covenants should be absolutely invalid if it so happened that all the affected landowners were to agree with the amendments.[62]

¶45 Finally, the district court astutely noted that "Utah appellate courts have repeatedly held" that "other unauthorized or fraudulent deeds or contracts" "are voidable and may be treated by the injured

---

[57] 2019 UT 62, ¶¶ 15, 47, 452 P.3d 1158.

[58] 2004 UT 23, ¶¶ 12, 17, 19, 89 P.3d 155.

[59] The same is true of *F.D.I.C. v. Taylor*, where the court of appeals held that a trust deed was ineffective to convey property where title was held by a corporation and the deed was executed by the person who controlled the corporation in his individual capacity. 2011 UT App 416, ¶¶ 3, 27, 267 P.3d 949.

[60] 2012 UT App 182, 283 P.3d 511.

[61] *Id.* ¶¶ 2, 4, 12.

[62] *See infra* ¶¶ 47–49.

party as valid."[63] "Indeed, if the *conveyance* of property to a third party by one who does not have authority to do so is merely voidable," we, like the district court, are "unable to find that the *encumbrance* of property through the recording of restrictive covenants by one who does not have authority to do so is void as against public policy."

¶46 For the foregoing reasons, we agree with the district court that the first *Ockey* factor weighs in favor of holding the restrictive covenants voidable, not absolutely void.

### B. The Covenants Do Not Harm the Public as a Whole

¶47 Having found no clear statement of public policy in statute or caselaw that would render the covenants absolutely void, we turn to the second *Ockey* factor and examine whether the covenants harm "the public as a whole."[64] The district court concluded that because the covenants potentially harmed "only those who own lots within the boundaries of the HOA," they did not harm the public as a whole.

¶48 The Landowners, who dedicate little ink to this factor in their briefing, do not convince us otherwise.[65] They do suggest that underlying the authority we examined under the first *Ockey* factor is "the well-settled principle that owning land 'carries with it the right to exercise dominion and control over it.'"[66] And they explain that "[v]iolating this principle harms the public because it calls into question the fundamentals upon which land ownership is based."

¶49 But our decision does not violate this fundamental property principle. The apparent facts of this case, in which an individual singlehandedly restricted nearly two thousand acres of land that did

---

[63] (Citing *Dillon v. S. Mgmt. Corp. Ret. Tr.*, 2014 UT 14, ¶¶ 28–29, 326 P.3d 656; *Frailey v. McGarry*, 211 P.2d 840, 845 (Utah 1949); *Ockey*, 2008 UT 37, ¶ 26; *Wittingham*, 2020 UT 49, ¶ 37.)

[64] *Wittingham*, 2020 UT 49, ¶ 24 (citation omitted).

[65] The Landowners assert that the first *Ockey* factor is the "most relevant" in this case. But courts are instructed to consider both factors, *see id.* ¶¶ 24–25, and where, as here, there is no clear statement of relevant public policy in statute or existing legal precedent, this second factor would be especially important to the determination of whether a contract is absolutely void.

[66] (Citing *Fisher v. Bountiful City*, 59 P. 520, 522 (Utah 1899).)

not belong to him, are extraordinary. But generally speaking, we cannot see how permitting landowners to ratify restrictive covenants violates their right to control their land. The Landowners point out that property owners who wish to be bound by otherwise invalid covenants could always record new, validly authorized ones. But in cases like this one, where numerous owners are involved and decades have passed since the initial recording, it may be advantageous to avoid such a process. Regardless, the fact that they retain the right not to ratify an otherwise invalid covenant adequately secures their property rights.

¶50 The Landowners further contended, at oral argument, that failing to hold the restrictive covenants absolutely void would undermine the accuracy of recorded documents, upon which the public relies. But well-established property doctrines such as adverse possession and boundary by acquiescence already recognize that actual property ownership sometimes varies from what is recorded in the public records. And if property owners who wish to ratify unauthorized recorded covenants are allowed to do so, then the public records would not be inaccurate in those instances.

¶51 All told, where we have held certain types of contracts void for public policy reasons in the past, the potential harm resulting from such contracts had broad reach.[67] The harm in this case—to the extent there is any—is limited to the landowners subject to the covenants. So we find that the second *Ockey* factor, like the first, weighs in favor of declaring the covenants voidable rather than absolutely void.

---

[67] *See, e.g.*, *Zion's Service Corp. v. Danielson*, 366 P.2d 982, 985–86 (Utah 1961) (voiding a contract whose purpose and effect was to control prices and restrain trade in a manner imposing costs on the public); *Hirtler v. Hirtler*, 566 P.2d 1231, 1231–32 (Utah 1977) (holding that contracting parties may not waive the right to assert a statute of limitations as a defense to an action because such statutes are designed "for the public good," and giving effect to waivers would lead to their insertion in contracts "as a matter of routine," opening the door "to the very abuses the statute was designed to prevent"); *Hawkins ex rel. Hawkins v. Peart*, 2001 UT 94, ¶¶ 10–13, 37 P.3d 1062 (holding that it violates public policy to enforce a parent's release of a minor's prospective claims for negligence and noting that an "exculpatory clause that relieves a party from future liability may remove an important incentive to act with reasonable care").

**Conclusion**

¶52 We hold that restrictive covenants that are recorded without the signature of the affected landowner are voidable, not absolutely void, and they are therefore ratifiable. The WLA, the statute of frauds, and our caselaw have not declared that such covenants are categorically void as against public policy. And because they affect only the individuals subject to them, and not the public as a whole, we decline to declare them absolutely void. It remains to be determined whether the Landowners ratified the covenants at issue in this case. Accordingly, we affirm the district court's denial of summary judgment and remand for further proceedings consistent herewith.

———————